**TGR ENTERPRISES, INC. et al. Appellants,**

v.

**KOZHEV et al. Appellees.**

[Cite as *TGR Ents., Inc. v. Kozhev,* 167 Ohio App.3d 29, 2006-Ohio-2915.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 20958.

Decided June 9, 2006.

30

A. Mark Segreti Jr., for appellants.

Jeffrey M. Silverstein, for appellees.

GRADY, Presiding Judge.

{¶ 1} This is an appeal from an order denying a motion for a preliminary injunction in a case involving an alleged breach of a noncompetition clause in an employment agreement.

{¶ 2} Defendants, Vitaly Kozhev and Irina Kozheva, who are husband and wife, are trained ballroom dancers and dance instructors. They had worked at a dance studio in Florida, and before that in Russia, when they were recruited by Tim and Barbara Haller in May 2002 to move to Dayton to work as dance instructors at an Arthur Murray franchise dance studio owned and operated by the Hallers through their corporation, TGR Enterprises, Inc. ("TGR"). Vitaly and Irina began working there for the Hallers the following month.

{¶ 3} On their first day of employment, Vitaly and Irina were presented by TGR with a personnel training agreement pertaining to their work as Arthur Murray dance instructors. The agreement contained several clauses which, read together, prohibit Vitaly and Irina from using proprietary information learned in their employment, including customer names and Arthur Murray dance instruction techniques, if employed as dance instructors by an Arthur Murray competitor for a period of two years after their employment by TGR terminates. Both signed the agreement.

{¶ 4} Vitaly and Irina's employment by TGR terminated in January 2004. It is unclear whether they quit or were fired. Several weeks later, Vitaly and Irina began working as dance instructors at Always Ballroom, a competitor of TGR's Arthur Murray studio, located about 12 miles distant.

{¶ 5} On February 18, 2004, TGR commenced an action for breach of contract against Vitaly and Irina. TGR sought money damages as well as injunctive relief. TGR also moved for a temporary restraining order and a preliminary injunction pursuant to Civ.R. 65(A) and (B), pending determination of their claims for relief, to prohibit Vitaly and Irina from continuing to work as dance instructors for Always Ballroom or any other competitor.

{¶ 6} After filing their complaint, the Hallers and TGR sold their Arthur Murray franchise to Mariusz and Paula Krasceweski and JPG International, L.L.C., who were later added as plaintiffs in the proceeding. For convenience and clarity, all the plaintiffs will hereinafter be identified as "Arthur Murray."

{¶ 7} On September 17, 2004, the trial court orally denied Arthur Murray's motion for a preliminary injunction and subsequently issued a written decision. Arthur Murray requested findings of fact and conclusions of law, which the trial court issued on February 9, 2005. Arthur Murray filed a timely notice of appeal.

Assignment of Error

{¶ 8} "The trial court erred and abused its discretion in denying plaintiffs' motion for a preliminary injunction seeking to enforce the contract between the parties against competing after termination of employment."

{¶ 9} Arthur Murray moved for a preliminary injunction to enjoin Vitaly and Irina from breaching their employment agreements and misappropriating trade secrets by using Arthur Murray's confidential information to call and solicit Arthur Murray's dance students and from using Arthur Murray's confidential information when instructing students at Always Ballroom, in direct competition with Arthur Murray. The trial court denied Arthur Murray's motion for a preliminary injunction on findings that Arthur Murray failed to establish a likelihood of success on the merits and a likelihood or threat of irreparable harm. Arthur Murray argues that the trial court abused its discretion in overruling its motion for a preliminary injunction by ignoring the contractual language of the parties and misapplying the test of irreparable harm, the defense of unclean hands, and the real-party-in-interest requirement.

{¶ 10} R.C. 2727.02 authorizes temporary injunctive relief, and states: "A temporary order may be granted restraining an act when it appears by the petition that the plaintiff is entitled to the relief demanded, and such relief, or any part of it, consists in restraining the commission or continuance of such act, the commission or continuance of which, during the litigation, would produce great or irreparable injury to the plaintiff, or when, during the litigation, it appears that the defendant is doing, threatens or is about to do, or is procuring or permitting to be done, such act in violation of the plaintiff's rights respecting the subject of the action, and tending to render the judgment ineffectual."

{¶ 11} "In determining whether to grant injunctive relief, the court considers the following factors: '(1) the likelihood or probability of a plaintiff's success on the merits; (2) whether the issuance of the injunction will prevent irreparable harm to the plaintiff; (3) what injury to others will be caused by the granting of the injunction; and (4) whether the public interest will be served by the granting of the injunction.'" *Premier Health Care Servs., Inc. v. Schneiderman* (Dec. 28, 2001) 2001 WL 1658167 quoting *Corbett v. Ohio Bldg. Auth.* (1993), 86 Ohio App.3d 44, 49, 619 N.E.2d 1145. An appellate court will not reverse a trial court's decision to deny or grant a temporary restraining order or preliminary injunction absent an abuse of discretion. *Engineering Excellence, Inc. v. Meola,* Franklin App. No. 01AP–1342, 2002-Ohio-5412, 2002 WL 31248192.

{¶ 12} Arthur Murray's request for a preliminary injunction is founded on the provisions in the personnel training agreements signed by Vitaly and Irina. Paragraph 8 of the agreements provides that Vitaly and Irina will not use the

names, addresses, and phone numbers of Arthur Murray's students "for any purpose, including, but not limited to, the solicitation of customers or students of Studio or Franchisor, or sending announcements to such customers or students regarding Applicant's subsequent employment, if any." Paragraph 9A of the agreements precludes Vitaly and Irina from revealing any "protected information," as that term is defined in the agreement, to any other person, and from using any protected information. "Protected information" is defined in paragraph 9 as "the unique and distinctive Arthur Murray methods as to dances, steps, teaching, instructional techniques, marketing techniques and operational procedures, names, addresses, phone numbers, preferences and abilities of students, customer lists, pricing information, and other matters, which Studio has been permitted by Franchisor to acquire and use." No time limit is put on those preclusions. Paragraph 9B precludes Vitaly and Irina, for a period of two years after employment termination, from using protected information in the city in which the studio is located or within 25 miles of the studio, whichever is greater. Paragraph 9C precludes them, for a period of two years after their employment terminates, from competing, as set forth in paragraphs 9A and 9B, with any Arthur Murray studio in any city, county, or metropolitan area in which an Arthur Murray studio is located.

{¶ 13} The trial court denied the prong of Arthur Murray's motion that asked the court to enjoin Vitaly and Irina from contacting and soliciting Arthur Murray's students on a finding that Arthur Murray failed to show that the phone calls Vitaly and Irina made were anything other than courtesy calls and that there was no evidence of irreparable harm to Arthur Murray. Arthur Murray argues that Vitaly and Irina improperly used the names and phone numbers of the Arthur Murray students, which are "protected information," to solicit business for Always Ballroom.

{¶ 14} The record contains the testimony of seven of Arthur Murray's dancing students: Robyn Clark, Lee Withers, Richard Hetrick, Melinda Dickerson, Sara Klaiber, Hiroshi Nakahara, and Katrina Lewis. Robyn Clark and her husband received three years of ballroom dance instruction at Arthur Murray, including instruction from Vitaly from June 2002 until January 2004. She heard about Vitaly's departure from Arthur Murray from mutual friends and asked those friends to give Vitaly her contact information. Vitaly subsequently contacted her, and she, along with her husband, completed five lessons with Vitaly at Always Ballroom. Vitaly did not encourage her to purchase additional lessons.

{¶ 15} Lee Withers began taking lessons from Irina at Arthur Murray in early 2003. In January 2004, Irina called Withers and told him that she was no longer employed by Arthur Murray. Several weeks later, Irina called Withers and told

him that she would be working at Always Ballroom and that it was less expensive at Always Ballroom. Withers did not take any lessons at Always Ballroom.

{¶ 16} As of March 26, 2004, Richard Hetrick had been a dance student at Arthur Murray for about four years, during which Irina was his primary instructor. Irina called him in January 2004 to let him know that she was no longer working at Arthur Murray. In response to Hetrick's question, Irina informed him that she was working at Always Ballroom. Hetrick signed up for 15 lessons with Always Ballroom, because he wanted to continue learning from Irina. However, he continues to take lessons at Arthur Murray Dance Studio.

{¶ 17} As of March 26, 2004, Melinda Dickerson had been a student at Arthur Murray for over four years. Vitaly was her principal instructor from June 2002 until January 2004. Vitaly called Dickerson in January 2004 and informed her that his employment with Arthur Murray had ended. He asked her to cancel an upcoming lesson at Arthur Murray and consider continuing her dance instruction with him at Always Ballroom. However, Dickerson did not take any lessons at Always Ballroom.

{¶ 18} Sara Klaiber began taking dance lessons at Arthur Murray in November 2001. Vitaly became one of her primary instructors at Arthur Murray in late 2002. She was contacted by Vitaly in January 2004 and was told that he and Irina no longer worked at Arthur Murray. Vitaly said he did not know what he was going to do, but thought that he might start working for another Arthur Murray studio. Subsequently, Klaiber found out from a mutual friend that Vitaly was going to work for Always Ballroom. Vitaly did not encourage Klaiber to take lessons with him, but she signed up for lessons with Vitaly at Always Ballroom. She continues to receive lessons at Arthur Murray, but fewer than she did in the immediately preceding year.

{¶ 19} Katrina Lewis began taking dance lessons at Arthur Murray in June 2003. She signed up for 115 lessons and completed 95 of them. Lewis worked with a number of instructors, but liked Vitaly best. Lewis was unhappy with the length of the drive she made to and from the Arthur Murray studio. When one of the other instructors alerted Lewis that Vitaly had been fired, Lewis canceled her remaining lessons at Arthur Murray. She noted that she might have left Arthur Murray even had Vitaly remained there, but that Vitaly was her only reason to stay at Arthur Murray. Lewis obtained Vitaly's phone number from directory assistance and asked him to let her know if he went to work somewhere else. Lewis estimated that she and her husband purchased approximately 15 lessons from Always Ballroom.

{¶ 20} Hiroshi Nakahara and his wife signed up for 15 lessons from Arthur Murray in November 2003. He and his wife had not used any of these lessons by the time Vitaly and Irina left Arthur Murray in January 2004. When Vitaly and

Irina left, the Nakaharas canceled their lessons at Arthur Murray, despite the fact that they did not know where or whether Vitaly and Irina might teach again. Vitaly called Nakahara and explained that he had been fired, but did not solicit the Nakaharas' business. Subsequently, the Nakaharas purchased lessons from Always Ballroom, because they felt that Vitaly and Irina were the only great teachers around for international dance. The Nakaharas moved back to Japan in March 2004.

{¶ 21} In sum, following their departure from Arthur Murray, Vitaly or Irina spoke with all seven of these students. The trial court found that this contact was not intended to solicit clients for Always Ballroom: "The fact that phone calls were made to students appears to be a courtesy more than anything and appears to be related on the emotion of having had a [sic] immediate disruption in employment for whatever reason as opposed to any attempt to solicit employees, or excuse me, solicit students."

{¶ 22} Even if the majority of phone calls were intended solely as a courtesy to let the students know that Vitaly and Irina would no longer be providing instruction at Arthur Murray, this contact arguably breaches paragraph 8 of the personnel training agreements, regardless of Vitaly's and Irina's intent. Moreover, the testimony of Amanda Dickerson and Lee Withers is sufficient to establish, at least with respect to them, that Vitaly and Irina violated the terms of the agreement by contacting them and soliciting their business. Therefore, the trial court erred in finding that Arthur Murray was not likely to show that Vitaly and Irina breached the agreements when they contacted students after their departure from Arthur Murray.

{¶ 23} This error, however, was harmless, because Arthur Murray failed to establish that it was likely to suffer irreparable injury from the improper contact with Arthur Murray's students. In order to be granted an injunction enforcing a noncompetition agreement, the plaintiff must demonstrate that it is likely to suffer irreparable injury as a result of the employee's breach of the agreement. R.C. 2727.02. " 'Irreparable harm exists when there is a substantial threat of material injury which cannot be adequately compensated through monetary damages.' *Restivo v. Fifth Third Bank* (1996), 113 Ohio App.3d 516, 521[, 681 N.E.2d 484]. * * * 'Such relief will be refused where the injury is so slight as to bring the case within the maxim " 'de minimus non curat lex," where there is no appreciable damage.' Id. at 520, 681 N.E.2d 484." *Single Source Packaging, L.L.C. v. Cain,* Miami App. No. 2003–CA–14, 2003-Ohio-4718, at ¶ 33, 2003 WL 22064129, *7.

{¶ 24} The trial court, in its findings of fact and conclusions of law, found that "[p]laintiffs have presented no evidence of irreparable harm to justify granting a preliminary injunction against Vitaly and Irina." The record contains insufficient

evidence that Melinda Dickerson or any other Arthur Murray student canceled lessons at Arthur Murray due to an improper contact by Vitaly or Irina. Hetrick and Klaiber continue to take lessons at Arthur Murray, Withers and Dickerson never took any lessons at Always Ballroom, the Nakaharas and Lewis canceled their lessons at Arthur Murray prior to any improper contact by Vitaly or Irina, and there is no evidence that Clark canceled any lessons at Arthur Murray due to contact by Vitaly or Irina.

{¶ 25} Even if any student had canceled lessons at Arthur Murray due to a breach of contract by Vitaly or Irina, Arthur Murray would have an adequate remedy at law for money damages caused by the cancellation, in the amount of the cost of the lessons that were refunded to the student due to the breaches by Vitaly and Irina. Therefore, the trial court did not abuse its discretion when it denied Arthur Murray's motion for a preliminary injunction enjoining Vitaly and Irina from contacting Arthur Murray's students.

{¶ 26} The trial court also denied Arthur Murray's motion to enjoin Vitaly and Irina from teaching students at Always Ballroom because Arthur Murray failed to show both a likelihood of success on the merits and great and irreparable injury. Specifically, the trial court found:

{¶ 27} "The testimony and the videotapes are * * * absolutely insufficient. There is insufficient evidence that the Defendants used any proprietary information. * * * The contract prohibits the use of proprietary information and there is not sufficient evidence before the court that proprietary information was used in a prohibited manner under the terms of this very vague contract."

{¶ 28} Arthur Murray argues that the videotape presented through Barbara Haller's testimony is sufficient to establish that Vitaly and Irina were using Arthur Murray's protected information. Arthur Murray argues that its unique dance steps and the definition of "protected information" and the prohibitions on use of such information in the personnel training agreements are so broad that the court necessarily must assume that Vitaly and Irina were using Arthur Murray's protected information when instructing at Always Ballroom.

{¶ 29} Arthur Murray's arguments ignore the substantial experience that Vitaly and Irina acquired as performers and instructors prior to working at Arthur Murray. Both Vitaly and Irina taught dancing and competed professionally in dance prior to their arrival in the United States. Further, they taught dancing in Florida for at least two studios prior to joining Arthur Murray in Dayton. Although Vitaly and Irina can be precluded from revealing Arthur Murray's trade secrets, they cannot be enjoined "from using knowledge and skill that is general in the trade as a whole.* * * 'A person who enters employment as an apprentice and leaves it as a master cannot be enjoined from using his

enhanced skills and knowledge in future employment.'" *Meola,* 2002-Ohio-5412, at ¶ 24, 2002 WL 31248192, *3, quoting *Wiebold Studio, Inc. v. Old World Restorations, Inc.* (1985), 19 Ohio App.3d 246, 248, 19 OBR 398, 484 N.E.2d 280.

{¶ 30} Based on a review of the witness testimony and the videotape that showed Vitaly and Irina teaching dance at Always Ballroom, the trial court found that there was insufficient evidence to show that Vitaly and Irina were using Arthur Murray's protected information when instructing the students at Always Ballroom. On that record we cannot find that the trial court abused its discretion in making that finding.

{¶ 31} The fact that the covenants in the personnel training agreements were written so broadly does not establish that Vitaly and Irina were necessarily using or revealing Arthur Murray's protected information. However, the breadth of the covenants does call into question whether the covenants are reasonable and enforceable under the factors set forth in *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 71 O.O.2d 12, 325 N.E.2d 544. For purposes of this appeal, it is unnecessary to apply the *Raimonde* factors because, even under the broad language contained in the personnel training agreements, the trial court did not abuse its discretion in finding that Arthur Murray failed to show an improper use of protected information.

{¶ 32} In addition, Arthur Murray failed to establish a likelihood of irreparable harm caused by the use of protected information. The trial court found:

{¶ 33} "The testimony about irreparable harm is at best vague and I have to consider the fact that we have a sale of the studio, we don't know if students left because there's a change in ownership, a change in interest. We know that the— that the Nakaharas left because they left the country, we know that students are taking lessons most particularly from Irina because they liked her style, they liked her personality, that's not a prohibition under the contract."

{¶ 34} Arthur Murray argues that the trial court erred because irreparable harm was established by the contractual provision stipulating to irreparable harm, the presumption of irreparable harm in trade secret cases, and the loss of Arthur Murray's customers to Always Ballroom. Paragraph 15 of the personnel training agreements signed by Vitaly and Irina provides:

{¶ 35} "The Parties hereto recognize that irreparable injury will result to Studio and/or Franchisor in the event of a breach of this agreement by Applicant and agree that in such event Studio and/or Franchisor shall be entitled, in addition to all other remedies and damages and without further proof of monetary or immediate damage, to an immediate injunction to restrain the violation hereof by Applicant and all persons acting for or with him."

■ {¶ 36} Arthur Murray argues that this provision eliminates the need to prove irreparable harm. However, a provision in a noncompetition agreement that contains a stipulation that any violation of the agreement would create irreparable injury is insufficient to establish irreparable injury, because "actual injury usually is not presumed. It must be proved." *Patio Enclosures, Inc. v. Herbst* (July 10, 2002), C.A.6 No. 01–3674, 39 Fed.Appx. 964, 970. See, also, *Premier Health Care Servs., Inc.,* supra, finding that a provision in an employment agreement that waives any claim that the employer has an adequate remedy at law is insufficient to establish irreparable injury. Further, whether irreparable injury occurred is a mixed question of law and fact to be determined by the court, per R.C. 2727.02, and cannot be resolved by a mere stipulation of fact.

{¶ 37} Arthur Murray cites *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 747 N.E.2d 268, for the proposition that the evidence creates a presumption that Arthur Murray has established at least a likelihood of irreparable harm. However, the decision in *Stoneham* is unconvincing.

{¶ 38} In *Stoneham,* Procter & Gamble Co. ("P & G") sued to enforce a covenant not to compete signed by a former employee who had worked for P & G for 13 years. During his tenure with P & G, the defendant had access to high level confidential information that he was required to know and use. The defendant left P & G to work for one of its principal competitors, holding a position substantially similar to his prior position at P & G. In his new employment, the defendant directly targeted the products he worked on when employed at P & G, directly discussed P & G's advertising campaigns, set up and trained global teams like the ones he had been on at P & G, and developed an initiative with the purpose of using information about P & G's brands to improve his new employer's products. Also, numerous P & G employees testified that a competitor could use the defendant's knowledge of P & G's confidential information and trade secrets to avoid the time-consuming and expensive steps that P & G took to develop the information, identify any weaknesses in the P & G brands, and preempt P & G's entry into new markets.

{¶ 39} Unlike the defendant in *Stoneham,* Vitaly and Irina came to Arthur Murray with a substantial amount of dancing experience and skills. Although they were encouraged to learn Arthur Murray's sales and dancing techniques, Vitaly and Irina often failed to attend the training sessions. Many of the dance steps Vitaly and Irina taught at Arthur Murray were learned prior to their employment at Arthur Murray. Also, unlike the defendant in *Stoneham,* Vitaly and Irina did not target Arthur Murray students, with the exception of Melinda Dickerson and Lee Withers, who ultimately did not cancel their lessons with Arthur Murray or purchase lessons from Always Ballroom.

{¶ 40} Finally, Arthur Murray argues that the likelihood of irreparable harm is demonstrated by the loss of business resulting from Arthur Murray students following Vitaly and Irina to Always Ballroom. The trial court found that the evidence presented was too vague to establish irreparable harm. The testimony of the seven dance students supports the trial court's finding. The students who took lessons at Always Ballroom gave a number of reasons why they continued to take lessons with Vitaly and Irina, none of which related to an alleged use of Arthur Murray's protected information. A personal preference to work with a particular instructor is not a sufficient basis on which to grant injunctive relief, unless the preference can be tied to improper conduct.

{¶ 41} On these facts, we cannot find that the trial court abused its discretion in finding that Arthur Murray failed to show that it is likely to suffer irreparable harm caused by any improper actions of Vitaly and Irina which are prohibited by the personnel training agreement. Moreover, any harm suffered by Arthur Murray could be adequately compensated through money damages, as the trial court found. Because it failed to show a likelihood of irreparable harm, Arthur Murray's motion for preliminary injunction was properly denied, and it is therefore unnecessary to consider Arthur Murray's other arguments that the trial court improperly applied the doctrine of unclean hands or the real-party-in interest requirement, which in any event are not determinative of the request for a preliminary injunction.

{¶ 42} The assignment of error is overruled, and the judgment of trial court is affirmed.

Judgment affirmed.

DONOVAN, J., concurs.

BROGAN, J., dissents.

BROGAN, Judge, dissenting.

{¶ 43} I dissent. TGR presented evidence that was essentially unrefuted that the Kozhevs violated the noncompetition provisions of their employment contract. It is uncontroverted that they received trade secrets during their employment. Proof of access to that confidential information and probable use is sufficient for injunctive relief. *Procter & Gamble Co. v. Stoneham* (2000), 140 Ohio App.3d 260, 747 N.E.2d 268. An actual threat of substantial harm is demonstrated when the former employee possesses knowledge of the employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer. Id. at 274, 747 N.E.2d 268. There is no suggestion that the time and distance restrictions in the noncompetition agreement were overbroad or unfair. Finally, the Kozhevs agreed in their contract that an immediate

**40**

injunction would be an appropriate remedy to enforce the provisions of their agreement.