**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio High School Athletic Assn. v. Ruehlman,* Slip Opinion No. 2019-Ohio-2845.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-2845

OHIO HIGH SCHOOL ATHLETIC ASSOCIATION *v.* RUEHLMAN, JUDGE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Ohio High School Athletic Assn. v. Ruehlman,* Slip Opinion No. 2019-Ohio-2845.]**

*Prohibition—Subject-matter jurisdiction—Common pleas court is a court of general jurisdiction with subject-matter jurisdiction that extends to all matters at law and equity that are not denied to it—No statute either withdraws jurisdiction from a common pleas court to hear claims challenging the rules adopted by a voluntary organization or vests exclusive jurisdiction over such claims in another court—Respondent properly exercised jurisdiction of the common pleas court—Writ denied.*

(No. 2018-1200—Submitted January 8, 2019—Decided July 16, 2019.)

IN PROHIBITION.

_____

**DeWINE, J.**

{¶ 1} This is an action for a writ of prohibition. The Ohio High School Athletic Association ("OHSAA") seeks to prohibit Judge Robert Ruehlman from taking further action in a lawsuit that was filed against it in the Hamilton County Court of Common Pleas. Because Judge Ruehlman does not patently and unambiguously lack jurisdiction, we deny the writ.

*The OHSAA adopts new rules governing postseason competitions*

{¶ 2} The OHSAA regulates high-school sports competitions in Ohio. It is a voluntary, unincorporated, private organization whose members include more than 1,600 public and private junior and senior high schools. Its functions include the regulation of postseason competitions.

{¶ 3} Traditionally, the OHSAA assigned schools to different divisions for postseason-competition purposes based on the number of boys or girls enrolled at each school. But some OHSAA members complained that private schools were winning state championships at a disproportionate rate. An OHSAA committee concluded that one reason for the success of the private schools was their ability to draw students from a wider geographic area than public schools, whose students generally come from their districts.

{¶ 4} In response to this concern, the OHSAA adopted "competitive-balance rules." These new rules use a formula to create an "adjusted enrollment count" to determine the division in which a school will be placed for postseason play for 8 of the 26 sports regulated by the association. Under the formula, a private high school is allowed a limited number of "feeder schools." The feeder schools are required to be from the same "system of education" (e.g., the Catholic Conference of Ohio or the Lutheran Schools of Ohio) and located within a single designated public-school-district attendance zone. If the private school enrolls a student-athlete who did not attend seventh and eighth grade in one of its designated feeder schools, then the school is penalized by having its adjusted enrollment count

2

increased. Thus, for example, if a Catholic high school enrolls a basketball player who, for seventh and eighth grades, attended a Catholic school that is not one of that high school's designated feeder schools, one extra student is added to the school's enrollment count for purposes of determining the division in which the school's basketball team will compete. For public schools, the formula is based on whether the student and at least one of his parents reside within the school district.

*Judge Ruehlman grants a temporary restraining order*

**{¶ 5}** Roger Bacon High School and the athletic conference of which it is a member, the Greater Catholic League Coed ("GCL Coed"), filed a lawsuit to enjoin application of the competitive-balance rules against GCL Coed schools. The plaintiffs' worry was that the Catholic feeder schools from which they traditionally received students did not all fall within a single designated public school attendance zone, and hence, under the new rules they would be penalized for enrolling student-athletes from some of those schools. Judge Ruehlman held that the OHSAA had acted arbitrarily and capriciously by enforcing the rules against the GCL Coed "without ever considering whether a school's team was competitive in the first place and then penalizing the GCL Coeds [sic] schools for enrolling students from Catholic Feeder Schools that have historically sent students to the GCL Coed schools." And he issued a temporary restraining order ("TRO") enjoining the application of the adjusted enrollment formula in cases where the high school enrolled a student who attended seventh and eighth grades at one of its traditional "Catholic Feeder Schools." The OHSAA responded by filing an original action in this court seeking a writ of prohibition to prevent Judge Ruehlman from taking further action in the case and to order him to vacate the TRO. After the OHSAA filed its lawsuit, we stayed Judge Ruehlman's TRO pending the resolution of this case. We now must decide whether to grant the writ.

*We deny the OHSAA's request for a writ of prohibition*

**{¶ 6}** We reserve the use of extraordinary writs for rare cases. A "writ of prohibition is an extraordinary remedy that is granted in limited circumstances with great caution and restraint." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554, 740 N.E.2d 265 (2001). "In the absence of a patent and unambiguous lack of jurisdiction, a court having general subject-matter jurisdiction can determine its own jurisdiction, and a party contesting that jurisdiction has an adequate remedy by appeal." *State ex rel. Plant v. Cosgrove*, 119 Ohio St.3d 264, 2008-Ohio-3838, 893 N.E.2d 485, ¶ 5. The OHSAA does not contend that it lacks an adequate remedy at law but, rather, seeks to rely on the narrow exception that allows us to issue a writ of prohibition "where there is a patent and unambiguous lack of subject matter jurisdiction," *State ex rel. Ohio Edison Co. v. Parrott,* 73 Ohio St.3d 705, 707, 654 N.E.2d 106 (1995).

**{¶ 7}** Here, Judge Ruehlman plainly had subject-matter jurisdiction over the lawsuit filed against the OHSAA. Under our Constitution, a court of common pleas has "original jurisdiction over all justiciable matters and such powers of review of proceedings of administrative officers and agencies as may be provided by law." Ohio Constitution, Article IV, Section 4(B). A common pleas court is a "court of general jurisdiction, with subject-matter jurisdiction that extends to 'all matters at law and in equity that are not denied to it.' " *Bank of Am., N.A. v. Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, 21 N.E.3d 1040, ¶ 20, quoting *Saxton v. Seiberling*, 48 Ohio St. 554, 558-559, 29 N.E. 179 (1891). And we have interpreted Article IV's mandate that the courts of common pleas have jurisdiction "as may be provided by law" to mean that "[t]he general subject matter jurisdiction of Ohio courts of common pleas is defined *entirely by statute*" (emphasis added), *State v. Wilson*, 73 Ohio St.3d 40, 42, 652 N.E.2d 196 (1995).

**{¶ 8}** With limited exceptions, R.C. 2305.01 grants the courts of common pleas subject-matter jurisdiction over "all civil cases in which the sum or matter in

4

dispute exceeds the exclusive original jurisdiction of county courts." This differentiates the courts of common pleas from other courts that (again, by statute) have more limited grants of jurisdiction. *See, e.g.*, *State ex rel. Goldberg v. Mahoning Cty. Probate Court*, 93 Ohio St.3d 160, 162, 753 N.E.2d 192 (2001) ("Probate courts are courts of limited jurisdiction, and probate proceedings are consequently restricted to actions permitted by statute and the Ohio Constitution").

{¶ 9} Because of R.C. 2305.01's general grant of jurisdiction, a court of common pleas has jurisdiction over any case in which the matter in controversy exceeds the jurisdictional limit unless some statute takes that jurisdiction away. *See State ex rel. Ohio Co. v. Maschari*, 51 Ohio St.3d 18, 20, 553 N.E.2d 1356 (1990). Thus, when we have found that a court of common pleas patently and unambiguously lacks jurisdiction, it is almost always because a statute explicitly removed that jurisdiction.[1] *See State ex rel. Albright v. Delaware Cty. Court of Common Pleas*, 60 Ohio St.3d 40, 42, 572 N.E.2d 1387 (1991) (noting that under R.C. 709, exclusive jurisdiction to consider annexation matters rests with the court of common pleas in the county in which the hearing on the annexation petition takes place); *State ex rel. Taft-O'Connor '98 v. Franklin Cty. Court of Common Pleas*, 83 Ohio St.3d 487, 488-489, 700 N.E.2d 1232 (1998) (noting that under R.C. 3517.151(A), the "Ohio Elections Commission has exclusive jurisdiction over the claims of fraudulent and false statements"); *State ex rel. Wilkinson v. Reed*, 99 Ohio St.3d 106, 2003-Ohio-2506, 789 N.E.2d 203, ¶ 16, 21 (noting that under R.C. Chapter 4117, the State Employment Relations Board has exclusive jurisdiction over charges of unfair labor practices); *State ex rel. Dir., Ohio Dept. of Agriculture*

---

[1] The one notable exception is a couple of cases in which the court said that a patent and unambiguous lack of *personal* jurisdiction could justify granting a writ of prohibition. *See State ex rel. Connor v. McGough*, 46 Ohio St.3d 188, 192, 546 N.E.2d 407 (1989); *Fraiberg v. Cuyahoga Cty. Court of Common Pleas*, 76 Ohio St.3d 374, 378, 667 N.E.2d 1189 (1996) (noting that it is possible, yet still rare, for a patent and unambiguous lack of personal jurisdiction to warrant a writ of prohibition).

*v. Forchione*, 148 Ohio St.3d 105, 2016-Ohio-3049, 69 N.E.3d 636, ¶ 29 (holding that R.C. 935.20(A) gives the Ohio Department of Agriculture the exclusive authority to order the quarantine or transfer of dangerous wild animals).

{¶ 10} The OHSAA asks us to depart from these principles. It points to no statute denying subject-matter jurisdiction to the court of common pleas but, instead, asks us to grant a writ of prohibition based on a few occurrences of the word "jurisdiction" in two of our previous decisions. *See State ex rel. Ohio High School Athletic Assn. v. Judges of Stark Cty. Court of Common Pleas*, 173 Ohio St. 239, 250, 181 N.E.2d 261 (1962) ("*Stark Cty. Judges*") ("Under these circumstances, a court has no jurisdiction to enjoin the association or its members from enforcing this lawfully imposed penalty"); *Lough v. Varsity Bowl, Inc.*, 16 Ohio St.2d 153, 154, 243 N.E.2d 61 (1968) (noting that the dispute "concerns the jurisdictional requirements for judicial review of the decision of a voluntary association").

{¶ 11} In relying on these cases, the OHSAA fails to account for the varying manners in which the word "jurisdiction" has been used. *See Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, 21 N.E.3d 1040, at ¶ 18; *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, ¶ 33. " 'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings.' " *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), quoting *United States v. Vanness*, 85 F.3d 661, 663 (D.C.Cir.1996), fn. 2. The "unspecified use of this polysemic word" often "lead[s] to confusion and has repeatedly required clarification as to which type of 'jurisdiction' is applicable in various legal analyses." *Kuchta* at ¶ 18. Thus, we have made clear, "There is a distinction between a court that lacks subject-matter jurisdiction over a case and a court that improperly exercises that subject-matter jurisdiction once conferred upon it." *Pratts* at ¶ 10.

**{¶ 12}** The cases relied upon by the OHSAA announced not a rule of subject-matter jurisdiction but, rather, a substantive legal rule of noninterference with the decisions of voluntary organizations absent special circumstances or a permissive statute. They are best understood as using the term "jurisdiction" in the loose sense of a court's legal authority to grant the relief sought by the plaintiff based upon the conduct alleged.

**{¶ 13}** The dissenting opinion disagrees with this characterization and reads *Stark Cty. Judges*, 173 Ohio St. 239, 181 N.E.2d 261, as making a claim about a court's subject-matter jurisdiction. Dissenting opinion at ¶ 36. We don't read that case that way. Indeed, such a reading would require us to ignore the constitutional and statutory grant of jurisdiction to the common pleas courts as well as vast swaths of case law. But insofar as the court in *Stark Cty. Judges* might be understood to have been making such a claim, it was doing so in error. As the United States Supreme Court has noted, such "drive-by jurisdictional rulings" resulting from a lack of precision in distinguishing between substantive law that limits a court's legal authority to grant the relief requested and a court's subject-matter jurisdiction should be given "no precedential effect" on the question of subject-matter jurisdiction. *Steel Co.* at 91.

**{¶ 14}** Indeed, there are many cases in which a court lacks the legal authority to grant the relief sought but nevertheless has subject-matter jurisdiction to hear the case. *See State ex rel. Enyart v. O'Neill*, 71 Ohio St.3d 655, 656, 646 N.E.2d 1110 (1995) ("the fact that [a judge] may have exercised that jurisdiction erroneously does not give rise to extraordinary relief by prohibition"). For instance, we have held that a lack of standing is not a jurisdictional defect warranting prohibition, even when the lack of standing deprives the court of "its power to hear the claim as asserted by [a] particular party." *State ex rel. Jones v. Suster*, 84 Ohio St.3d 70, 77, 701 N.E.2d 1002 (1998). We have held that a judge's lack of authority to join a party to a suit is not a basis for issuing a writ. *State ex rel. Shumaker v.*

*Nichols*, 137 Ohio St.3d 391, 2013-Ohio-4732, 999 N.E.2d 630, ¶ 31. And issuing a writ of prohibition is improper even if the statute of limitations has expired. *See State ex rel. Huntington Trust Co., N.A. v. Franklin Cty. Court of Common Pleas*, 10th Dist. Franklin No. 98AP-122, 1998 Ohio App. LEXIS 3465, *9 (July 28, 1998).

**{¶ 15}** Eager to decide the merits, the dissenting opinion proclaims that we need not reach the question whether the court of common pleas patently and unambiguously lacked jurisdiction, because the OHSAA has no adequate remedy at law. Dissenting opinion at ¶ 19. It reaches this conclusion based on a handful of opinions in which we suggested that even if a party can appeal, an appeal may be inadequate in certain "special circumstances" or under a "dramatic fact pattern." *E.g., State ex rel. Toledo Metro Fed. Credit Union v. Ohio Civ. Rights Comm.*, 78 Ohio St.3d 529, 531, 678 N.E.2d 1396 (1997). It is noteworthy that the dissent cites no cases in which we invoked this exception.[2] Nevertheless, the dissent asserts that this case merits unique treatment because of the "truly rare and extraordinary" effects it imagines Judge Ruehlman's restraining order will have on third parties. Dissenting opinion at ¶ 31. But third parties are often affected by court orders—frequently in ways that are more dramatic than what is presented here. Were we to adopt the dissent's proposed "third party" exception, it would quickly swallow up the principle that absent a patent and unambiguous lack of jurisdiction, a writ of prohibition should not be granted when a party can appeal the lower court's order.

**{¶ 16}** Further, what the dissent finds so dramatic here is simply the minor effect that the TRO may have on the calculations used for determining which teams make the postseason. Dissenting opinion at ¶ 24. But any effect on postseason assignments is speculative, at best, and there is no reason to think that the OHSAA

---

[2] The only case noted by the dissent in which we granted a writ of prohibition involved a narrow First Amendment issue that is not applicable here. *See State ex rel. News Herald v. Ottawa Cty. Court of Common Pleas*, 77 Ohio St.3d 40, 44-45, 671 N.E.2d 5 (1996).

could not make adjustments, consistent with the TRO, that would prevent any unfairness. Moreover, the TRO will be in effect only until a ruling on the preliminary injunction, a hearing on which was originally scheduled for just 13 days after the restraining order was put in place. There is little reason to think that in that short time frame the "turmoil" imagined by the dissent would come to pass. Dissenting opinion at ¶ 24.

{¶ 17} The subject matter of this dispute falls squarely within the jurisdiction granted by the Ohio Constitution and Revised Code to the Hamilton County Court of Common Pleas. There is no statute that withdraws jurisdiction from common pleas courts to hear claims challenging the rules adopted by voluntary organizations or that vests exclusive jurisdiction over such claims in another court. Thus, Judge Ruehlman properly exercised the subject-matter jurisdiction of the Hamilton County Court of Common Pleas. Whether he ruled correctly in exercising the court's jurisdiction is a matter that under our precedent must be left in the first instance to the court of appeals on direct review. For that reason, we deny the writ.

*Conclusion*

{¶ 18} For the above reasons, we deny the OHSAA's request for a writ of prohibition. And finding oral argument to be unnecessary in this case, we deny the OHSAA's motion for oral argument.

Writ denied.

KENNEDY, FRENCH, FISCHER, and STEWART, JJ., concur.

O'CONNOR, C.J., dissents, with an opinion joined by DONNELLY, J.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 19} To obtain a writ of prohibition, the relator must show "the exercise of judicial power, the lack of authority for the exercise of that power, and the lack of an adequate remedy in the ordinary course of law." *State ex rel. Ford v.*

*Ruehlman*, 149 Ohio St.3d 34, 2016-Ohio-3529, 73 N.E.3d 396, ¶ 61.  At issue here is the adequate-remedy requirement, and an exception to that requirement providing that the relator need not show the lack of an adequate remedy when the trial court "patently and unambiguously" lacks jurisdiction, *State ex rel. Doe v. Capper*, 132 Ohio St.3d 365, 2012-Ohio-2686, 972 N.E.2d 553, ¶ 11.

{¶ 20} Here, a writ prohibiting the enforcement of the temporary restraining order ("TRO") issued by the trial court is proper because relator, the Ohio High School Athletic Association ("OHSAA"), has established the first two requirements and there is no adequate remedy at law.  Furthermore, even if there were an adequate remedy at law, a writ would still be proper under the exception to the adequate-remedy requirement.  I therefore respectfully dissent.

## I.  NO ADEQUATE REMEDY AT LAW

{¶ 21} To be an adequate remedy at law, an available remedy must be " '*adequate* under the circumstances' " of the case.  (Emphasis added in *Butler*.) *State ex rel. Cody v. Toner*, 8 Ohio St.3d 22, 23, 456 N.E.2d 813 (1983), quoting *State ex rel. Butler v. Demis*, 66 Ohio St.2d 123, 124, 420 N.E.2d 116 (1981).  "An appeal is inadequate if not complete in nature, beneficial, and speedy." *State ex rel. Yeaples v. Gall*, 141 Ohio St.3d 234, 2014-Ohio-4724, 23 N.E.3d 1077, ¶ 33.  In this regard, we have held that an appeal is inadequate when there are "special circumstances or a 'dramatic fact pattern.' " *State ex rel. Toledo Metro Fed. Credit Union v. Ohio Civ. Rights Comm.*, 78 Ohio St.3d 529, 531, 678 N.E.2d 1396 (1997), quoting *Fraiberg v. Cuyahoga Cty. Court of Common Pleas*, 76 Ohio St.3d 374, 379, 667 N.E.2d 1189 (1996).

{¶ 22} The present case involves exactly the sort of special circumstances and dramatic fact pattern that warrant the conclusion that an appeal would not be an adequate remedy, thereby justifying this court's intervention.  A confluence of three factors supports this finding: (1) the TRO entered against the OHSAA by respondent, Judge Robert Ruehlman, will cause immediate harm to a large number

of third parties across the state, namely many, if not all, of the 809 high schools that are members of the OHSAA but not the plaintiffs in the underlying action;[3] (2) the TRO was granted based on a misapplication of existing law; and (3) the availability of an appeal upon the issuance of a final order will not provide complete and speedy relief from the widespread harm inflicted on the affected third parties. Similar concerns have led us to grant a writ of prohibition in the past. For example, in *State ex rel. News Herald v. Ottawa Cty. Court of Common Pleas*, 77 Ohio St.3d 40, 42-45, 671 N.E.2d 5 (1996), we granted a writ of prohibition dissolving a "patently unconstitutional" gag order that caused harm to a large number of third parties—three Ohio newspapers and, by extension, their readers—that could not meaningfully be undone on appeal.[4]

### A. Immediate and widespread harm to third-parties

{¶ 23} The most notable aspect of the TRO is the immediate harm it will cause to a large number of third parties: the 809 public and private high schools around the state that are members of the OHSAA but not the Greater Catholic League Co-Ed, which includes eight private high schools (collectively, "the GCL Coed schools"). The TRO bars enforcement of the competitive-balance rules as to the GCL Coed schools, but it leaves the rules in place as to the other 809 member high schools. This court temporarily stayed the TRO upon the filing of this writ action, but if permitted to take effect, the TRO will throw many, if not all, of those 809 third-party member schools' schedules and postseason tournament assignments into disarray.

---

[3] The plaintiffs in the underlying action are Roger Bacon High School and the Greater Catholic League Co-Ed, which includes Roger Bacon and seven other private high schools.

[4] It was the third-party newspapers seeking the writ in *News Herald*, but that distinction matters little. The unique circumstances of this case are that the third parties are all members of the OHSAA, which is seeking to protect them from harm that will occur immediately upon the TRO's taking effect.

**{¶ 24}** Member schools set their schedules many months in advance of each season, based in part on their opponents' postseason division assignments under the current OHSAA bylaws, including the competitive-balance rules. But as the OHSAA notes, if permitted to take effect, the TRO "would eliminate the current tournament assignments for the OHSAA's member high schools, putting all fall sport post-seasons in complete disarray, requiring all to be re-worked on the fly and causing irreparable harm to those school[s] that scheduled regular season opponents based on an expected divisional assignment." For example, a football team that scheduled a game against Roger Bacon High School believing that it would count as a Division IV opponent for postseason-tournament purposes would find that Roger Bacon now counts as only a Division V opponent—a change that could cause that high school to miss the football postseason tournament, for which qualification is limited and based largely on the division of a school's opponents during the regular season. The TRO is therefore an extremely disruptive act that, if permitted to take effect, will upend the status quo and immediately cause turmoil in high-school sports across the state. The trial court completely failed to account for this harm to the third-party member high schools impacted by its order. The majority does the same in allowing the trial court's TRO to take effect.[5]

---

[5] The majority asserts that any effect the TRO will have on postseason assignments is "speculative, at best." Majority opinion at ¶ 16. The evidence shows otherwise. The competitive-balance rules were first implemented in the 2017-2018 school year. That year, according to figures provided by the OHSAA, the rules caused dozens of division changes in football (22 schools moved up a division and 16 moved down), volleyball (17 schools moved up a division and 13 moved down), boys basketball (23 schools moved up a division and 20 moved down), girls basketball (15 schools moved up a division and 13 moved down), and other affected sports. Whatever sport one considers, changes in one team's division assignments will, by definition, impact the postseason tournament in that team's new division and former division, as each division's tournament will relate to a different set of teams.

Perhaps recognizing that the impact of the TRO here is *not* speculative, the majority suggests that the OHSAA might avoid these harms because "there is no reason to think that the OHSAA could not make adjustments, consistent with the TRO, that would prevent any unfairness." Majority opinion at ¶ 16. That is the very definition of speculation, and any such "adjustments" would only risk increasing the upheaval caused by the TRO.

**B. Clear misapplication of existing law**

{¶ 25} When considering whether to grant injunctive relief, a trial court should consider the plaintiff's likelihood of success on the merits, whether injunctive relief is necessary to prevent irreparable harm to the plaintiff, what injuries will be caused to third parties if the restraining order or injunction is granted, and whether the injunctive relief will serve the public interest. *TGR Ents., Inc. v. Kozhev*, 167 Ohio App.3d 29, 2006-Ohio-2915, 853 N.E.2d 739, ¶ 11 (2d Dist.); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985). Here, all four factors weighed heavily against granting a TRO, and the trial court failed to properly assess each.

*1. Likelihood of success*

{¶ 26} The trial court clearly erred in assessing the likelihood-of-success factor. The claim made by the GCL Coed schools against the OHSAA—a voluntary, nonprofit association—is unprecedented. The first flaw in their claim is their reliance on case law that is clearly inapplicable here. The GCL Coed schools asserted that the OHSAA was prohibited from acting in an "arbitrary and capricious" manner, but as authority, the schools cite opinions setting forth the rule that an arbitrary and capricious order or decision may not be issued by a board or agency of a *political subdivision*. *See, e.g.*, *Moore v. Union Twp. Bd. of Twp. Trustees*, 152 Ohio App.3d 535, 2003-Ohio-2085, 789 N.E.2d 252 (2d Dist.). The OHSAA is obviously not a board or agency of a political subdivision. That case law has absolutely no application here.

{¶ 27} Beyond that, every other decision the GCL Coed schools rely on is similarly inapplicable. As explained below, this court has held that " 'courts will not interfere with the internal affairs of voluntary associations' " like the OHSAA, except under certain circumstances not present here. *State ex rel. Ohio High School Athletic Assn. v. Judges of Stark Cty. Court of Common Pleas*, 173 Ohio St. 239, 247, 181 N.E.2d 261 (1962) (hereinafter, "*Stark Cty. Judges*"), quoting 4 American

Jurisprudence, Associations and Clubs, Section 17, at 466 (1936). The cases cited by the GCL Coed schools in their pleadings before the trial court involve one of the exceptions set forth in *Stark Cty. Judges* regarding *quasi-judicial* decisions made by an OHSAA tribunal. *See*, *e.g.*, *Lewis v. Ohio High School Athletic Assn.*, 5th Dist. Stark No. 2015CA00009, 2015-Ohio-3459 (judicial review of the decision of an OHSAA appeals panel upholding the commissioner's refusal to grant an eligibility waiver to a student athlete). But those cases are completely inapplicable to the GCL Coed schools' claim here, which asserts that the competitive-balance rules themselves are arbitrary and capricious, notwithstanding the fact that they were duly enacted and have been applied consistently to all member schools. Indeed, the competitive-balance rules were adopted pursuant to the requirements of the OHSAA's constitution, and they went through a lengthy and thorough process of consideration, in which GCL Coed schools actively participated.[6] The schools have not claimed that any of the OHSAA's procedures were not followed as the rules were enacted, nor have they claimed that the OHSAA has failed to apply those rules to its members in an even and consistent manner. The GCL Coed schools simply object to the substance of the rules, arguing that the method the rules use to achieve competitive balance is unfair to the GCL Coed schools. This claim therefore falls under the prohibition against interfering with the internal affairs of a voluntary association stated in *Stark Cty. Judges*. The trial court failed to recognize this lack of a likelihood of success on the merits.

---

[6] Among other things, the OHSAA formed the Competitive Balance Committee in 2010 to study competitive-balance concerns and propose rules to address those concerns. Two GCL Coed schools were represented on that committee. The committee proposed rules that were voted on by the OHSAA's membership but rejected in 2011. In 2012 and 2013, the OHSAA members also voted down two other sets of proposed rules based on the committee's work. It was only after these failed attempts and additional efforts by the committee to identify a solution that the committee proposed the competitive-balance rules ultimately adopted in 2014.

### 2. Irreparable harm to the GCL Coed schools

{¶ 28} The trial court also erred in finding that the GCL Coed schools would suffer irreparable harm without a TRO. The GCL Coed schools claim that without a TRO, (1) their postseason division assignments will not be fair and equitable and (2) it will be "more difficult for the [GCL Coed schools] to schedule non-conference regular season games." Those assertions are *far* too vague and speculative to constitute a clear and convincing showing of irreparable harm warranting a TRO during the pendency of the litigation before Judge Ruehlman. *See Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 124 Ohio App.3d 308, 315, 706 N.E.2d 336 (10th Dist.1997) (requiring that irreparable harm be shown by clear and convincing evidence).[7]

### 3. Harm to third parties and the public interest

{¶ 29} The harm-to-third-parties factor weighs heavily against granting a TRO for the reasons discussed above. So does the public-interest factor, which here, lies in preserving the status quo—specifically, preserving the schedules and postseason tournament assignments set across the state pursuant to the currently-in-effect competitive-balance rules.

## C. Inadequacy of an appeal as a remedy for third-party harm

{¶ 30} The OHSAA will not be able to appeal the TRO until a final order is issued. At the earliest, that will occur when Judge Ruehlman reaches a decision on a preliminary injunction. *See* R.C. 2505.02(B) (defining "final order"). But that appeal will take far too long to avoid the above-described substantial and widespread harm to third parties. Furthermore, compensatory damages could not make those third parties whole. Given the short duration of high-school sports

---

[7] The GCL Coed schools also claim that Roger Bacon High School was forced "to give up a home football game in order to fill its regular season schedule." Assuming that this is true, any lost revenue from ticket sales and concessions at a home game could be compensated by money damages. Beyond that, any claim of harm from playing an additional away game in one football season is vague and speculative.

seasons and the unknown amount of time before a final order regarding a preliminary injunction will be issued, an appeal by the OHSAA at some point in the future would not be an adequate remedy for the third-party harms discussed above.

**{¶ 31}** This case therefore presents special circumstances warranting the conclusion that the OHSAA lacks an adequate remedy at law. This case does not involve a TRO that preserves the status quo or that impacts only the relator or a small number of third parties. Rather, it presents the truly rare and extraordinary situation in which immediate harm, not compensable by money damages, will be caused to a large number of third parties across the entire state, based on a plainly erroneous application of the law. The trial court has clearly gone astray, and an appeal is not an adequate remedy under the circumstances of this case. This court should grant a writ of prohibition, and the trial court's reckless order should be vacated.[8]

## II. LACK OF SUBJECT-MATTER JURISDICTION

**{¶ 32}** Even if an adequate remedy at law did exist, a writ prohibiting enforcement of the TRO would still be proper because the trial court patently and unambiguously lacks subject-matter jurisdiction under *Stark Cty. Judges*, 173 Ohio St. 239, 181 N.E.2d 261. The majority's characterization of *Stark Cty. Judges* as a decision not relating to subject-matter jurisdiction is contradicted by our opinion in *Stark Cty. Judges* itself.

**{¶ 33}** *Stark Cty. Judges* involved the OHSAA's season-long suspension of a high-school football team for violating an OHSAA rule. A county prosecutor brought suit in the Stark County Court of Common Pleas seeking injunctive relief against nine individuals who served as officers and members of the board of the

---

[8] With respect to the other two requirements for a writ of prohibition, the trial court has clearly exercised judicial power, and the lack of authority for its exercise of that power is shown by *Stark Cty. Judges*, 173 Ohio St. 239, 181 N.E.2d 261, the case discussed in the next section.

OHSAA and 45 boards of education. On the same day the case was filed, the trial court issued a TRO prohibiting the defendants from taking any actions to enforce the OHSAA's suspension of the high-school football team for the 1962-1963 school year. The OHSAA then sought a writ of prohibition from this court that would bar the trial court from enforcing the TRO.

{¶ 34} This court granted the writ. We reviewed the law concerning when a court may entertain suits against private, voluntary associations, including the " 'well established' " rule that " 'courts will not interfere with the internal affairs of voluntary associations, except in such cases as fraud or lack of jurisdiction.' " *Id.* at 247, quoting 4 American Jurisprudence at 466. A court may intervene in an association's internal affairs only when the association's " 'officers are acting in excess of their powers, or collusion or fraud is claimed to exist on the part of the officers or a majority of the members.' " *Id.*, quoting 5 Ohio Jurisprudence 2d, Associations, Section 7, at 440 (1954). We also recognized certain limited circumstances, such as the decision to discipline, suspend, or expel a member, in which a court may address decisions of a voluntary association's tribunals.[9] Accordingly, we granted the writ sought by the OHSAA because under the circumstances present in that case, "a court has *no jurisdiction* to enjoin the association or its members from enforcing [its] lawfully imposed penalty." (Emphasis added.) *Id*. at 250.

{¶ 35} The majority here believes that the holding of *Stark Cty. Judges* does not concern subject-matter jurisdiction, asserting that the decision uses the word "jurisdiction" in an "unspecified" manner, creating confusion regarding the type of jurisdiction at issue. Majority opinion at ¶ 11. Instead, the majority concludes that

---

[9] Such actions are "quasi-judicial," and a court may interfere with the decision of an association's tribunal only " 'to ascertain whether or not the proceeding was pursuant to the rules and laws of the society, whether or not the proceeding was in good faith, and whether or not there was anything in the proceeding in violation of the laws of the land.' " *Id.*, quoting 4 American Jurisprudence at 472.

*Stark Cty. Judges* is "best understood as using the term 'jurisdiction' in the loose sense of a court's legal authority to grant the relief sought by the plaintiff based upon the conduct alleged." Majority opinion at ¶ 12.

{¶ 36} The majority's reading of *Stark Cty. Judges* is incorrect. In particular, concerns over the loose or unspecified use of the term "jurisdiction" are not present here, because our opinion in *Stark Cty. Judges* clearly specifies that it addresses the OHSAA's claim that the trial court's entry of the TRO was "without jurisdiction of the subject matter." *Stark Cty. Judges*, 173 Ohio St. at 246-47, 181 N.E.2d 261. It was with respect to that claim that this court analyzed the law on voluntary associations and held that the trial court had "no jurisdiction to enjoin the association." *Id*. at 250. We therefore made it perfectly clear that we were issuing a holding on subject-matter jurisdiction.

{¶ 37} Because Roger Bacon High School and the GCL Coed's suit against the OHSAA that triggered the present action falls outside the narrow exceptions set forth in *Stark Cty. Judges*, the trial court patently and unambiguously lacks subject-matter jurisdiction.[10]

### III. CONCLUSION

{¶ 38} I believe that the requirements for a writ of prohibition have been met. The trial court has exercised judicial power without authority, and there is not an adequate remedy at law. Furthermore, the trial court's actions were taken despite a patent and unambiguous lack of subject-matter jurisdiction. I would therefore grant the writ. I respectfully dissent.

DONNELLY, J., concurs in the foregoing opinion.

_____

---

[10] The majority also takes the position that "when we have found that a court of common pleas patently and unambiguously lacks jurisdiction, it is almost always because a statute explicitly removed that jurisdiction." Majority opinion at ¶ 9. That position similarly fails to support a denial of the writ in this case. To say that something is "almost always" the case does not establish the matter conclusively, particularly in light of well-settled precedent of this court holding otherwise.

18

Keating, Muething & Klekamp, P.L.L., Joseph M. Callow Jr., Daniel E. Izenson, Bryce J. Yoder, and Taylor V. Trout; and Steven L. Craig, for relator.

James W. Harper, Hamilton County Chief Assistant Prosecuting Attorney, and Andrea Neuwirth and Jay R. Wampler, Assistant Prosecuting Attorneys, for respondent.

Ennis Britton Co., L.P.A., and Hollie F. Reedy, urging granting of the writ for amici curiae, Ohio School Boards Association, Buckeye Association of School Administrators, Ohio Association of School Business Officials, Ohio Interscholastic Athletic Administrators Association, and Ohio Association of Secondary School Administrators.

_____