DECISION.
{¶ 1} In this employment-agreement case, we hold that the trial court did not err in refusing to grant an injunction. Harm was speculative and a legal remedy was available. And though we approve and followProcter Gamble v. Stoneham,[1] it does not apply to the facts here.
 I. Tartar and Aero's Divorce {¶ 2} Plaintiff-appellant Aero Fulfillment Services, Inc., appeals the trial court's judgment denying its request for injunctive relief.
 {¶ 3} Aero is a fulfillment-services company based in Cincinnati, Ohio. The fulfillment industry encompasses database services, digital services, Internet services, mail processing, and telemarketing.
 {¶ 4} Tartar began working at Aero in about 1990. The 15-year marriage between Tartar and Aero ended in January 2005, when Tartar accepted employment at W.A. Wilde, Inc.
 {¶ 5} In 1998 Tartar signed the employment agreement at issue. Aero attempted to amend the agreement at a later date, but was unable to produce a signed copy of the new agreement. Consequently, as the trial court correctly noted, this case is governed by the 1998 employment agreement. Also, Tartar stipulated that the 1998 agreement is valid and enforceable, and that there is no dispute about the reasonableness of its limitations.
 {¶ 6} The noncompete agreement provided that Tartar would return confidential materials, and that he would not (1) disclose confidential information; (2) solicit Aero's employees to terminate employment for 12 months after his departure; or (3) for 12 months after termination of employment compete within 100 miles of Cincinnati, Ohio, or solicit Aero prospects or customers. The agreement further stipulated that a violation of the covenants would result in irreparable injury and damage to Aero.
 {¶ 7} When Tartar left, he was Vice President of Sales, and he accepted a similar position with Wilde. The breakup was because Tartar disagreed about Aero's strategic direction.
 {¶ 8} Wilde is also a fulfillment company, but it is based in Brockton and Holliston, Massachusetts. Wilde characterizes Aero's services as distinguishable from its own because Aero provides "pick, pack, and ship" fulfillment services, whereas Wilde's predominant business is at the "front end."
 II. Aero Sues {¶ 9} Tartar left Aero in January 2005. In late June 2005, Aero sued in the Hamilton County Common Pleas Court, seeking damages and injunctive relief. About four months after the complaint was filed, Aero moved for both preliminary and permanent injunctive relief. The trial court held a hearing, and after three days of testimony it denied Aero's request for injunctive relief. The court found that injunctive relief was not warranted because Aero had failed to present convincing evidence of irreparable harm.
 {¶ 10} On appeal, Aero now argues that (1) the trial court's insistence on proof of customer loss at the injunction stage was contrary to this court's holding in Procter Gamble Co. v.Stoneham and ignored the contractual prohibitions against using Aero's trade secrets and influencing Aero employees to leave; and (2) the trial court erred by failing to give effect to the contract language independently allowing for injunctive relief.
 {¶ 11} We may reverse the trial court's decision only if Aero can demonstrate that the trial court abused its discretion in denying injunctive relief to Aero.[2]
 III. Actual Harm? {¶ 12} The thrust of Aero's argument is that the trial court erred by requiring a showing of actual harm. But a close reading of the trial court's judgment reveals that it denied injunctive relief because Aero could not show that it would be irreparably harmed if injunctive relief was not granted.
 IV. The Noncompete Agreement {¶ 13} Section 5 of Tartar's employment contract is labeled Employee's Acknowledgments and Covenants. Subsections 5(a) through (e) are at issue and are labeled in the following manner: (a) Confidential Materials and Information, (b) Non-Solicitation of Employees, (c) Covenant Against Unfair Competition, (d) Return of Confidential Materials and Information, and (e) Irreparable Harm.
 {¶ 14} The confidential-materials-and-information subsection, subsection 5(a), required that Tartar, during his employment and after its termination, not reproduce, publish, disclose, use, reveal, show, or otherwise communicate any of Aero's confidential materials and informationunless specifically assigned or directed by Aero to do so. Of course, an employee has this duty even without an agreement.[3] And perhaps "use or communicate" might have sufficed.
 {¶ 15} Subsection 5(b) prohibited solicitation of Aero employees. That section required that while Tartar was employed at Aero and for 12 months after that employment ended for any reason, Tartar not directly or indirectly induce or attempt to induce or influence an Aero employee to terminate employment with Aero when Aero desired to retain that employee's services.
 {¶ 16} The covenant against unfair competition, subsection 5(c), prohibited Tartar, while employed by Aero and for 12 months after his employment ended for any reason, from working for any mailing or fulfillment operation located within 100 miles of Cincinnati, Ohio, and from working within 100 miles of any Aero mailing or fulfillment operation. Subsection 5(c) further prohibited Tartar from soliciting Aero customers or prospects with whom he had business contacts during his most recent 12 months with Aero. But six months after the termination of his employment, Tartar could solicit and communicate with Aero prospects located more than 100 miles from Cincinnati.
 {¶ 17} In the return-of-confidential-materials-and-information subsection, subsection 5(d), Tartar agreed that, at the end of his employment, he would immediately return all documents containing or referring to Aero's confidential materials and information with no request being required.
 {¶ 18} Finally, in subsection 5(e), discussing irreparable harm, Tartar agreed that a breach of subsections 5(a) through (d) would result in irreparable injury and damage to Aero for which no adequate remedy at law would be available, and that if he breached any of the covenants, Aero would be entitled to an immediate restraining order and to an injunction to prevent such violation or continued violation, and to all costs and expenses, including attorney fees. We note that an irreparable-harm clause, such as the one in question, does not necessarily establish that irreparable harm has occurred by a breach of a covenant, though it may weigh in favor of a finding of irreparable harm. Each case presents a different factual scenario that must be independently reviewed to determine whether a breach will result, or has resulted, in irreparable harm.[4]
 V. Confidential Materials and Information {¶ 19} Aero argues that Tartar breached the covenant against disclosing and misappropriating confidential materials and information because, according to Aero, he "testifie[d] to possessing detailed and comprehensive knowledge of Aero's confidential information and trade secrets and to actually using that information in his new employment to solicit fulfillment industry business." We are puzzled by Aero's circumlocutious conclusion that Tartar used confidential materials to solicit business.
 {¶ 20} In reality, Tartar used parts of the Brock Study (a marketing study) at a Mailing and Fulfillment Services Association (MFSA) conference. Aero's assertion that Tartar used this information to solicit fulfillment-industry business is specious — as is much of its interpretation of the record.
 {¶ 21} The MFSA is a trade organization with about 600 members — both Aero and Wilde are members. AstroZeneca, a former Aero client, called the MFSA about a contract that was coming up for bidding. The MFSA referred the names of about six companies who could perform the job. Wilde happened to be one of the six companies, but when AstroZeneca found out about Tartar's noncompete agreement, Wilde was not allowed to bid on the contract. The MFSA referred Wilde's name to an Aero customer, and the assertion that Tartar used Aero's confidential information to solicit that customer's business is simply not supported by the record.
 {¶ 22} But we are concerned about whether Tartar's MFSA presentation required that the trial court grant Aero injunctive relief. Injunctive relief is an equitable remedy that should only be used when there is no adequate remedy at law.[5] Injunctive relief is not a right, but the trial court in its discretion may grant injunctive relief to prevent a future wrong that the law is unable to redress.[6] In deciding whether a preliminary injunction should issue, a court should consider (1) the likelihood of success on the merits; (2) whether the party seeking the injunction will be irreparably harmed absent an injunction; (3) the harm to others if the injunction is granted; and (4) the public's interest in granting an injunction.[7]
 {¶ 23} The trial court decided that Aero had failed to show that it would be irreparably harmed absent an injunction. The court found that even if Tartar had breached the confidentiality portion of the noncompete agreement, Aero had failed to present evidence that (1) Tartar or Wilde interfered with or solicited any of Aero's customers, or (2) Tartar's actions were linked to a loss of Aero clientele, business, or employees.
 VI. Stoneham does not Apply {¶ 24} We hold that Stoneham is factually distinguishable from this case. And we further hold that the record fails to show irreparable harm because Aero (1) was not reasonably prompt in its motion for injunctive relief, (2) failed to treat the Brock Study as confidential, and (3) failed to show a threat of harm sufficient to justify equitable relief — in other words, Aero had an adequate remedy at law.
 {¶ 25} In Stoneham, this court held that to show irreparable harm in the absence of an injunction, the moving party need not prove actual harm: the mere threat of harm is sufficient.[8] In that case, a threat of harm existed where an employee possessed knowledge of an employer's trade secrets and began working in a position that caused him to directly compete with the former employer and the product line that the employee formerly directed. The Stoneham case represented Procter 
Gamble's attempt to keep its identifiable trade secrets confidential. We held that actual harm need not be proved: the mere threat of actual harm was sufficient — it would have been impossible for Stoneham to "unknow" information about P G's plans to "roll out" different types and brands of haircare products. In this case, Aero failed to identify any specific trade secrets or confidential information that Tartar had misappropriated — or could have even used to Aero's detriment. In fact, Aero did nothing more than make unsubstantiated allegations that it would suffer incalculable or irreparable harm absent injunctive relief.
 {¶ 26} In an action for injunctive relief, where the threat of harm is speculative, the moving party must do more than make a conclusory allegation of the threat of harm. There must be evidence to support that allegation. Otherwise in such instances, injunctions could be granted with little or no showing of a possibility of irreparable harm. InStoneham, the evidence was overwhelming. Stoneham was based on the inevitable-disclosure doctrine. That factor is not present here.
 {¶ 27} And though the mere threat of harm may be sufficient to grant an injunction, the harm threatened must be irreparable, and the movant must make some showing as to why the harm cannot be remedied through compensatory damages. Merely concluding that irreparable harm will result is not sufficient — the law does not recognize an injunction by accusation.
 {¶ 28} In Stoneham, the employee worked at P G's haircare division; and he was familiar with product-specific market research results, financial data related to the costs and profits of the products, and the technological developments in existing new products. Stoneham left P G to work for Alberto-Culver — a direct competitor. Alberto-Culver competed in the same markets, and its products competed directly with P G's haircare products. And Stoneham was in charge of that exact product line at his new employer.
 {¶ 29} The Stoneham decision was product-driven. Therein we noted that through the years Stoneham had acquired extensive product-specific knowledge. He knew, among other things, the product areas in which P G would expand or reduce its business; product-sensitive information concerning which types of advertising were most successful; which line of products would optimize profit; the products that sold best in theforeign markets; information concerning development of new haircareproducts; which products were closest to market and when and where they would be launched; the strengths and weaknesses of theproducts; the strengths and weaknesses of the company's scientific backup for its claims about the products; the price for the newproducts, and the targeted profits; which products would be relaunched; the perceived weaknesses of the relaunched products; the changes made or to be made in the products, and the anticipated costs of relaunch. We note that this information was tangible, highly technical, and specific. In Stoneham, the likelihood of irreparable harm was immediately apparent and concrete.
 {¶ 30} Aero and Wilde compete in a service industry. The specific facts alleged in this case merely showed that Tartar used general marketing data about the service industry in which Aero competed. Aero's competitors could have easily and properly ascertained this data through their own market research. Aero likewise failed to present evidence that the Brock Study had contained critical information, which, if leaked, would have caused irreparable harm.
 {¶ 31} Moreover, Aero failed to explain how this information would have given Tartar and Wilde any competitive advantage whatsoever. Finally, Aero's lax approach to keeping the Brock Study confidential convinces us that Tartar's alleged misappropriation of the information it contained did not cause, and would not have caused, irreparable harm. Where in Stoneham the trade secrets were product-based, in this case, the alleged trade secret was a general marketing study about customer preferences in the fulfillment-service industry as a whole. We also note that because marketing trends often change quickly, the information contained in most market-research studies becomes stale quickly.
 {¶ 32} Aero also alleged that Tartar's MFSA presentation caused it to "scrap its implementation of the Brock Study, begin a new marketing scheme, and address the fact that [Tartar] exposed the Study to Aero competitors and customers." But that alleged harm had already occurred and the damages were calculable. Also, because Tartar had already exposed the alleged trade-secret information at the MFSA conference, Aero no longer had any legitimate business interest to protect in the divulged information — gran ting injunctive relief under these circumstances would have been illogical.[9] And as we have mentioned, because marketing data is time-sensitive, Aero would have likely needed to conduct a new study to analyze the current market regardless of Tartar's alleged breach.
 {¶ 33} Aero's assertion that it has been orwill be incalculably or irreparably harmed absent an injunction is substantially weakened by the fact that it waited a considerable length of time before moving for an injunction. Where injunctive relief is requested, actions speak louder than words, and motions speak loudest of all.[10] Aero moved for injunctive relief in October 2005 — about three months after the action was filed, almost ten months after Tartar had left, and two and a half months before the expiration of the noncompete and nonsolicitation-of-employees covenants. The lack of urgency in filing the injunctive-relief motion militated against a finding of irreparable harm. Though the facts of each case will differ, we are not persuaded that the "confidential information and trade secrets" involved in this case warranted the extraordinary relief that Aero sought at the injunctive-relief hearing.
 {¶ 34} Aero also argues that Tartar solicited its customers for business and attempted to persuade Aero employees to terminate their employment. As we have already mentioned, these subsections of the agreement expired in January 2006, one year after Tartar had terminated his employment with Aero.
 {¶ 35} At the injunctive-relief hearing, the testimony showed that none of Aero's customers had become a customer of Wilde. Moreover, there was no evidence showing that Tartar would have likely solicited Aero customers during November and December 2005 (the two months remaining before the nonsolicitation-of-Aero-customers covenant expired). In fact, Tartar consistently maintained his resolve to abide by the agreement.
 {¶ 36} Similarly, the hearing testimony indicated that none of Aero's employees had left Aero because of Tartar's alleged solicitation. Further the facts neither indicated that any Aero employee had left Aero to work at Wilde, nor showed that Tartar had recruited any Aero employee to do so. Finally, the record fails to show that it was likely that Tartar would have solicited Aero employees to leave during November and December 2005.
 {¶ 37} The hearing testimony demonstrated that Tartar had communicated to an employee that "resigning from Aero is the right thing to do," and that "Aero is crazy, we should all just leave." But such suggestions must be considered in the context in which they were made. Aero characterizes Tartar's statements as solicitation, but we are convinced that the record contains evidence tending to show that Tartar was merely giving friendly advice and that the proffered advice did not constitute solicitation as prohibited by the agreement. Again, no employee left Aero to work for Wilde, and the facts failed to show that Tartar had solicited any employee to do so.
 {¶ 38} Finally, Aero's argument that Tartar misappropriated customer lists (by failing to return them) is likewise meritless, where Aero identified its clients on its own website.
 VII. No Injunction {¶ 39} We hold that, at the injunction hearing, Aero did not establish that it had lost any customers, or that it would have lost any customers absent an injunction. Likewise, Aero did not establish that any employees had left Aero because of Tartar's communications, or that any employee would have left Aero absent injunctive relief. And it did not establish that the inevitable-disclosure doctrine applied.
 {¶ 40} The purpose of injunctive relief is not to perpetuate axe grinding. And injunctive relief is not an appropriate remedy to redress past wrongs.[11] But, on the testimony presented at the injunction hearing, we refuse to conclude that the divulged information was not a trade secret. The question whether a particular knowledge or process is a trade secret is one of fact to be determined by the trier of fact on the greater weight of the evidence.[12]
 {¶ 41} Accordingly we limit our holding to the facts presented at the injunction hearing and conclude that Aero failed to demonstrate the requisite irreparable harm or threat thereof.[13] We affirm the trial court's judgment denying Aero injunctive relief and remand the cause to the trial court for further proceedings.
Judgment affirmed and cause remanded.
HENDON and WINKLER, JJ., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] (2000), 140 Ohio App.3d 260, 747 N.E.2d 268.
[2] See Stoneham, supra, 140 Ohio App.3d at 269.
[3] See The Ohio Uniform Trade Secrets Act, R.C. 1333.61 through1333.69; see, also, Fred Siegel Co., L.P.A. v. Arter Hadden (1999),85 Ohio St.3d 171, 707 N.E.2d 853.
[4] See, e.g., Premier Health Care Serv., Inc. v. Schneiderman, 2nd Dist. No. 18795, 2001-Ohio-7087.
[5] See Garono v. State (1988), 37 Ohio St.3d 171, 173,524 N.E.2d 496.
[6] See id.
[7] See Stoneham, supra, 140 Ohio App.3d at 267-268.
[8] See Stoneham, supra.
[9] See, e.g., Jacono v. Invacare Corp., 8th Dist. No. 86605, 2006-Ohio-1596, at ¶ 20.
[10] See, generally, George Basch Co. v. Blue Coral, Inc. (C.A.2, 1992), 968 F.2d 1532, 1542.
[11] See Clark v. Mt. Carmel Health (1997), 124 Ohio App.3d 308, 315,706 N.E.2d 336, citing State ex rel. Great Lakes College, Inc. v. StateMed. Bd. (1972), 29 Ohio St.2d 198, 280 N.E.2d 900.
[12] See Fred Siegel Co., supra.
[13] See, e.g., Premier Health Care Serv., Inc. v. Schneiderman, 2nd Dist. No. 18795, 2001-Ohio-7087.