[Cite as *State v. Cincinnati Complaint Auth.*, 2019-Ohio-5349.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-180509 |
| | | C-180510 |
| Relator-Appellee, | : | TRIAL NO.  A-1800400 |
| vs. | : | |
| | | *O P I N I O N.* |
| CITY OF CINCINNATI CITIZEN COMPLAINT AUTHORITY, | : | |
| | : | |
| Respondent-Appellant, | : | |
| and | : | |
| | : | |
| CINCINNATI BLACK UNITED FRONT, | : | |
| Intervenor-Appellant. | : | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: December 27, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, *Mark C. Vollman* and *Andrea B. Nuewirth*, Assistant Prosecuting Attorneys, for Relator-Appellee State of Ohio,

*Paula Boggs Muething*, City Solicitor*,* and *Emily E. Woerner*, Chief Counsel, for Respondent-Appellant City of Cincinnati Citizen Complaint Authority,

*Gerhardstein & Branch Co., LPA*, *Alphonse Gerhardstein* and *Janaya Trotter Bratton*, for Intervenor-Appellant Cincinnati Black United Front.

**BERGERON, Judge.**

{¶1}    Designed to foster more trust and cooperation between the police and public than had previously prevailed, the Collaborative Agreement has played an instrumental role in this community for the better part of two decades.  Consistent with the mandate of a federal lawsuit, Cincinnati's City Council approved the Collaborative Agreement and gave the Citizen Complaint Authority ("CCA") the force of law, by promulgating it into the city's Administrative Code.  The CCA exists as a key check instilled by the Collaborative Agreement, as it conducts an independent investigation of (among other things) uses of force by police officers.

{¶2}    The present case stems from an effort by the state of Ohio to enjoin the investigatory work of the CCA during the pendency of any related felony criminal case.  The trial court granted a permanent, and sweeping, injunction, but it did so while skipping a critical step in the injunction analysis–it never determined that the state had prevailed on its claim.  A party cannot secure a permanent injunction without winning the underlying lawsuit.  Equally important, the state failed to adduce clear and convincing evidence of irreparable harm on the record below.  Instead, the harm posited by the state was inherently speculative because its only witness knew nothing about the factual situation surrounding the controversy that precipitated the injunction request.

{¶3}    Based on the record before us, we reverse the trial court's decision and remand for dissolution of its injunction.

I.

{¶4}    Underlying the CCA's origins is the Collaborative Agreement, the federal class action agreement forged in the wake of the civil unrest in Cincinnati sparked by the shooting of unarmed-teenager Timothy Thomas in 2001.  At its core,

the Collaborative Agreement represents an attempt to improve relations between the police force and the Cincinnati communities it serves. To that end, the Collaborative Agreement brought together various stakeholders including the city, the Cincinnati Police Department ("CPD"), the ACLU, and the Cincinnati Black United Front ("CBUF"), who then negotiated the terms of the agreement. Ultimately, a federal court blessed the agreement and the city memorialized aspects of it into law in its Administrative Code.

{¶5} Integral to its plan to improve police and community relations, the Collaborative Agreement provided for the creation of the CCA as a vehicle to create more accountability. Codified by a city ordinance, the CCA includes a director (Kim Neal), a team of investigators, and a seven-member-citizen board, and it is charged with conducting independent, administrative investigations of complaints of police misconduct and uses of force ("serious police interventions" in the parlance of the Administrative Code). Cincinnati Adm.Code Article XXVIII.

{¶6} The CCA discharges its duties by conducting interviews with the police officers, as well as other parties involved in the incident, with the goal of determining whether the conduct at issue conformed to internal police policies. If a "serious police intervention" occurs, the CPD must "immediately" notify the CCA, and the CCA shall "immediately" dispatch its investigators to investigate. Cincinnati Adm.Code, Article XXVIII, Section 3-A. After all, if the CCA does not timely conduct its investigations, much of the point is lost. For that reason, "[t]he time required to complete investigations will be a performance accountability measure." *Id.* After conducting relevant interviews and reviewing other pertinent evidence, the CCA interviewer generates a summary of findings and reports to the CCA director. Once the director reviews and approves the report, the case is then presented to the CCA

3

board at its monthly meeting. The board may either agree or disagree with the director's determination on the matter. Although it has never happened in the 17-year history of the CCA (as the testimony before the trial court established), the board may also convene a hearing if it sees the need to delve further into the matter. The board ultimately renders a determination as to the director's report and shares the report with the city manager and the chief of police. A challenge to the CCA's investigatory process lies at the heart of this appeal.

{¶7} In early 2018, the CCA notified two Cincinnati police officers to appear for investigatory interviews related to a report of shots fired. The underlying incident involved officers responding to a domestic violence complaint, which escalated into a shootout between two police officers and an individual named Damion McRae. Mr. McRae shot and seriously wounded one of the responding officers and was criminally charged.

{¶8} In this particular case, the two officers also happened to be state's witnesses in the looming criminal prosecution of Mr. McRae. Fearing interference with the criminal prosecution, the state, through the Hamilton County Prosecutor's Office, commenced this action and moved for a temporary restraining order, seeking to halt the CCA's scheduled interviews with the two police officers. Though the CCA initially agreed to postpone the interviews, the dispute persisted and culminated in a hearing before the trial court. By that point, the state sought to permanently enjoin the CCA from not only conducting interviews in the McRae case, but in all cases involving police officers who were also witnesses in a felony criminal prosecution.

{¶9} At the hearing on the permanent injunction, only two witnesses testified. Seth Tieger, an assistant prosecuting attorney for Hamilton County, appeared for the state and CCA Director Kim Neal testified on behalf of the CCA. To

support the grant of the permanent injunction, Mr. Tieger opined that the state would suffer irreparable harm by potential inadvertent disclosures by police of information that might be shared with them by the prosecutor's office, including the prosecutor's confidential work product or the identity of confidential informants. Mr. Tieger posited that this information could then be a part of CCA investigative materials, which a criminal defendant could possibly obtain through a public records request in contravention of the Ohio Rules of Criminal Procedure. Admittedly though, Mr. Tieger did not know how the CCA interviews were conducted, as he had never attended one and was unfamiliar with its procedures. He also was unaware of whether information from investigations was redacted, and admitted to speculating on the threat of harm: "[i]t would be speculation, but I don't know how remote that speculation would be."

{¶10} Although speculative, the harm that Mr. Tieger articulated, time and again throughout his testimony, was twofold: (1) a police officer might have access to the prosecutor's work product and trial strategy, and inadvertently disclose that to the CCA, which could then be "devastating" to the state's criminal prosecution; and (2) a police officer might divulge the identity of a witness or confidential informant, and that person could be killed. That harm formed the underpinning of the state's entire pitch for injunctive relief—criminal defendants could secure access to this information and create litigation turmoil or kill witnesses. But Mr. Tieger could not (nor did he attempt to) connect either of these harms to the McRae case because he did not "know any of the specifics" about that case. The state thus adduced no evidence that any prosecutor had shared confidential work product or trial strategy with either of the two officers who the CCA wished to interview, nor that they possessed any information about a confidential informant or related witness in the

5

case (because there were none). Likewise, in the 17-year history of the CCA, Mr. Tieger could offer no examples where the type of harm he envisioned actually came to pass.

{¶11} For her part, Ms. Neal provided context to CCA hearings and how they work in practice. She explained that CCA investigators were trained to avoid case-specific inquiries, including never asking a police officer whether they met with a criminal prosecutor in a given case or, for that matter, about any criminal prosecution matters. Ms. Neal also confirmed that interviewers would never ask a police officer about the order of witnesses in a criminal prosecution, nor about a prosecutor's personal thoughts or tactics related to a criminal prosecution, and she confirmed that the CCA investigator would never ask about the identity of confidential informants. She also emphasized that the purpose of the CCA interviews is to "conduct an administrative investigation on the officer's use of his firearm" and that the CCA previously "never had a problem with the prosecutor's office. * * * [W]e have had hundreds, probably over a thousand cases where a complainant is being prosecuted. * * * And we've never been asked to hold off on administrative investigations because they are in fact administrative."

{¶12} Indeed, the CCA investigation mirrors the internal investigation conducted by the CPD in the wake of any discharge of a weapon by an officer. Both the CCA investigations and CPD internal investigations include conducting interviews with the officers involved, questioning other witnesses, and generating reports regarding the investigation's findings. Moreover, the materials generated from the police department's internal investigations are then shared with the CCA. The only notable difference between the two investigative processes is that the CPD may also conduct criminal investigations in these matters, whereas the CCA's

investigation is purely administrative. Notably, the state did not seek to enjoin the parallel CPD investigations that cover the same terrain.

{¶13} As Ms. Neal testified, the McRae case arose by operation of the administrative code because it implicated an officer-involved shooting. According to Ms. Neal, officer-involved shootings follow a different process than a citizen complaint. Whenever shots are fired by a police officer, CCA receives a call from the 911 center, and a CCA investigator automatically responds to the scene. The investigator observes the scene as well as the subsequent interviews of the officers and witnesses conducted by CPD at its office.

{¶14} CCA then awaits the conclusion of the CPD investigation before proceeding with its own investigation. CPD sends a copy of its investigatory report to CCA, which includes all available videotaped footage, the report of the internal investigation regarding the use of force, and a copy of all recorded interviews. Because CCA is not permitted to investigate criminal matters, CCA must receive a "letter of declination" from the prosecutor's office before continuing its administrative review. The letter confirms that the officer who discharged his or her firearm will not be criminally prosecuted. In this case, CCA received the letter regarding the McRae shooting in August 2017.

{¶15} When the state initially commenced the underlying lawsuit in this case, it believed that Mr. McRae had initiated the complaint against the two officers. Based on that erroneous belief, the state expressed legitimate, although ultimately inapplicable, concerns that Mr. McRae was attempting to subvert the discovery rules and obtain information that he would not otherwise be entitled to receive. As Mr. Tieger admitted, his testimony focused on theoretical possibilities regarding information that could potentially be disclosed during the CCA investigative process.

7

{¶16} After hearing testimony from both witnesses, the court ultimately granted a permanent injunction against the CCA, which enjoined "conducting interviews or hearings involving police officers who are State's witnesses in a related and ongoing criminal proceeding until after the rendering of a verdict in a criminal trial, or earlier disposition of the case."

{¶17} Shortly thereafter, the CBUF moved to intervene and sought a new trial. CBUF professed to be unaware that the parties broadened the scope of the temporary restraining order to a permanent injunction and from the McRae case to all cases. It maintained that the CCA did not adequately represent its interests in the prior proceeding. The court ultimately denied the motion, deeming it untimely and finding that CBUF's interests aligned with the CCA's.

{¶18} Both the CCA and CBUF now appeal. The CCA raises a single assignment of error, challenging the propriety of the grant of the permanent injunction. CBUF presents two assignments of error, which concern the grant of the permanent injunction and the denial of its motion to intervene and for a new trial.

II.

A.

{¶19} The grant of a permanent injunction is an " 'extraordinary remedy in equity where there is no adequate remedy available at law.' " *City of Toledo v. State,* 154 Ohio St.3d 41, 2018-Ohio-2358, 110 N.E.3d 1257, ¶ 15, quoting *Garono v. State,* 37 Ohio St.3d 171, 173, 524 N.E.2d 496 (1988). Therefore, "its issuance may not be demanded as a matter of strict right[.]" *Vontz v. Miller,* 2016-Ohio-8477, 111 N.E.3d 452, ¶ 54 (1st Dist.), quoting *Perkins v. Village of Quaker City,* 165 Ohio St. 120, 125, 133 N.E.2d 595 (1956). And parties seeking injunctive relief bear a "substantial

burden" to demonstrate their entitlement to equitable intervention. *Connor Group v. Raney*, 2d Dist. Montgomery No. 26653, 2016-Ohio-2959, ¶ 17.

{¶20} Because the grant of a permanent injunction is not an interim remedy, a court may only issue it after a hearing in which the moving party demonstrated success on the merits of its underlying claim, i.e., "a right to relief under the applicable substantive law." *Procter & Gamble Co. v. Stoneham,* 140 Ohio App.3d 260, 267, 747 N.E.2d 268 (1st Dist.2000); *W. Branch Local School Dist. Bd. of Edn. v. W. Branch Edn. Assn.*, 2015-Ohio-2753, 35 N.E.3d 551, ¶ 15 (7th Dist.) ("Or in other words, the moving party must prove that he has prevailed on the merits."). The party seeking a permanent injunction must also demonstrate that the injunction is necessary to prevent irreparable harm and that no adequate remedy at law is available. *Stoneham* at 267. Speculative harm will not suffice. *See Camp Washington Community Bd., Inc. v. Rece*, 104 Ohio App.3d 750, 754, 663 N.E.2d 373 (1st Dist.1995) ("Equity will not interfere where the anticipated injury is doubtful or speculative * * * .").

{¶21} While we review the grant or denial of a permanent injunction for an abuse of discretion, *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.*, 73 Ohio St.3d 590, 604, 653 N.E.2d 646 (1995), a party must prove that entitlement to the requested relief by clear and convincing evidence. *Stoneham* at 268. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). We also review legal issues decided within the injunction framework under a de novo standard. *Vontz* at ¶ 26; *City of Cleveland v. State*, Slip Opinion No. 2019-Ohio-3820, ¶ 15 ("The determination whether a statute or ordinance is constitutional is a

question of law that we review de novo."). Equally important, we must respect the Ohio Supreme Court's admonition "that a court 'cannot employ equitable principles to circumvent valid legislative enactments.' " *City of Toledo* at ¶ 16, quoting *Lake Hosp. Sys., Inc. v. Ohio Ins. Guar. Assn.*, 69 Ohio St.3d 521, 526, 634 N.E.2d 611 (1994).

B.

{¶22} We pause briefly to note that the trial court never found that the state prevailed on the merits of its quest for relief (and certainly not by clear and convincing evidence). The state insists that its complaint contained an underlying claim for a declaratory judgment requesting a determination "that the Relator is entitled to complete the pending criminal prosecution of Damion McRae without interference from the City of Cincinnati/Citizen Complaint Authority" and to issue "a finding that the hearings/interviews scheduled in front of the Citizen Complaint Authority * * * would jeopardize/compromise/interfere with the effective prosecution of Damion McRae."

{¶23} Giving the state the benefit of the doubt (as the complaint never identifies any cause of action), we will construe its claim as one for declaratory relief. Ohio's Declaratory Judgment Act, R.C. Chapter 2721, allows courts to declare the rights or status of parties that arise in particular circumstances, such as under a contract or law, as well as the legal relations between parties. *Waldman v. Pitcher*, 2016-Ohio-5909, 70 N.E.3d 1025, ¶ 18 (1st Dist.), quoting *Radaszewski v. Keating*, 141 Ohio St. 489, 496, 49 N.E.2d 167 (1943) ("Ohio's Declaratory Judgment Act is 'remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations.' "); R.C. 2721.03; Civ.R. 57. But we must be mindful that the "Declaratory Judgment Act does not authorize a

10

court to render an advisory opinion." *Waldman* at ¶ 20. This flows from constitutional constraints on the subject matter jurisdiction of common pleas courts, as the Ohio Constitution limits that jurisdiction to "justiciable matters." Ohio Constitution, Article IV, Section 4(B); *City of Cincinnati v. Fourth Natl. Realty, LLC,* 1st Dist. Hamilton Nos. C-180156 and C-180174, 2019-Ohio-1868, ¶ 25 ("The subject-matter jurisdiction of common pleas courts is limited to justiciable matters."); *Mallory v. Cincinnati,* 1st Dist. Hamilton No. C-110563, 2012-Ohio-2861, ¶ 10 ("The Ohio Constitution * * * limits the subject-matter jurisdiction of common pleas courts to 'justiciable matters[.]' "). To that end, a declaratory judgment action in particular requires "a controversy 'between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Burger Brewing Co. v. Liquor Control Comm., Dept. of Liquor Control,* 34 Ohio St.2d 93, 97, 296 N.E.2d 261 (1973), quoting *Peltz v. S. Euclid,* 11 Ohio St.2d 128, 131, 228 N.E.2d 320 (1967).

{¶24} To prevail on declaratory judgment, a party must establish an underlying legal basis for its claim for relief. But the trial court never made a finding that the state had prevailed on its claim for a declaratory judgment, and thus it never wrestled with the underlying legal basis for the claim (or the "applicable substantive law," in the words of *Stoneham*, 140 Ohio App.3d at 267, 747 N.E.2d 268).[1] On appeal, the state's brief likewise fails to explicate this point, leaving us with little guidance on the substantive nature of its claim. Given the record (i.e., confronted with a permanent injunction yet no finding of success on the merits), we need not decide the merits question and instead turn to evaluate the irreparability of harm.

---

[1] To the extent that the dissent suggests that the proponent of a permanent injunction need not present a meritorious claim for relief, that would contravene our holding in *Stoneham*.

C.

{¶25} The state of the record magnifies the importance of the irreparability of harm. "A party seeking a permanent injunction must show that the injunction is necessary to prevent irreparable harm[.]" *Stoneham* at 267. This flows from the premise that injunctions are meant to prevent future harms, rather than as a remedy for redressing past wrongs. *Aero Fulfillment Servs., Inc. v. Tartar,* 1st Dist. Hamilton No. C-060071, 2007-Ohio-174, ¶ 40 ("The purpose of injunctive relief is not to perpetuate axe grinding. And injunctive relief is not an appropriate remedy to redress past wrongs."). Ultimately, the party seeking the injunction bears the burden to present evidence establishing that, absent the injunction, it will suffer irreparable harm. *Id.* at ¶ 26; *City of Middletown v. Butler Cty. Bd. of Cty. Commrs.*, 12th Dist. Butler No. CA94-03-084, 1995 WL 55320, *2 (Feb. 13, 1995) ("It is well-established that in order to obtain an injunction, the moving party must show by clear and convincing evidence that immediate and irreparable injury, loss or damage will result to the applicant[.]").

{¶26} While the law does not require that a party suffer actual harm in order to secure injunctive relief, as the party bearing the burden of proof, the state was required to prove the existence of an actual threat of harm here. *See e2 Solutions v. Hoelzer*, 6th Dist. Lucas No. L-08-1295, 2009-Ohio-772, ¶ 32 (plaintiff is required to establish existence of an actual threat of harm); *Stoneham* at 274 (party presented clear and convincing evidence which established a "very real threat"). Mere speculation of harm will not suffice. *Aero Fulfillment Servs.* at ¶ 27 ("Merely concluding that irreparable harm will result is not sufficient—the law does not recognize an injunction by accusation."); *see Camp Washington,* 104 Ohio App.3d at 754, 663 N.E.2d 373, quoting *Miller v. W. Carrollton*, 91 Ohio App.3d 291, 296, 632

N.E.2d 582 (2d Dist.1993) ("Equity will not interfere where the anticipated injury is doubtful or speculative; reasonable probability of irreparable injury must be shown."); *Fodor v. First Nat. Supermarkets, Inc.*, 8th Dist. Cuyahoga No. 58587, 1990 WL 93210, *5 (July 5, 1990) (error to grant injunctive relief when "[a]ny damage which may have occurred was speculative and could not thereby be considered irreparable.").

{¶27} As noted above, the state presented a twofold argument to support its claim of irreparable harm, insisting that if the CCA proceeded with the interviews, this could irreparably harm criminal prosecutions by (1) disclosing confidential work product to criminal defendants, and (2) revealing the identities of confidential informants, potentially exposing them to intimidation, retaliation, and even murder. But despite alleging that the CCA could divulge this information, the state failed to present any evidence that the officers here knew confidential information, that CCA investigations would solicit such information, that the officers could divulge such information (if they knew it), or that this information could eventually find its way to criminal defendants. Rather, the state's vision of harm hinged on a causal chain so attenuated that even its witness had to concede that speculative nature of the theory.

{¶28} Because the state's allegations of harm centered on access and possession of certain confidential knowledge, we find our caselaw dealing with non-compete agreements and trade secrets instructive because they also involve parties trying to enjoin actors from divulging confidential information. In *Stoneham,* 140 Ohio App.3d 260, 747 N.E.2d 268, we considered a claim for injunctive relief stemming from a noncompete agreement and alleged misappropriation of trade secrets. We explained there that a threat of harm may suffice for granting injunctive relief, but also focused on the evidence presented, which clearly and convincingly

established that a former employee had intimate knowledge of confidential information (trade secrets) and that his "use or disclosure of P&G's information was not just a threat, it was a substantial probability." *Id.* at 274. Evidence pervaded the record that not only did the employee possess knowledge of damaging, confidential information, but also that he and his new employer had taken steps to implement programs that would necessarily utilize the knowledge he obtained in his former employment. *Id.* at 275. Thus, the threat of harm "was substantially likely to result." *Id.*

{¶29} In contrast, in *Aero Fulfillment Servs., Inc.,* 1st Dist. Hamilton No. C-06007, 2007-Ohio-174, we upheld the denial of injunctive relief when the party seeking to obtain the injunction failed to present any evidence of likely irreparable harm. The information at issue was not confidential, nor could the proponent establish the former employee had misappropriated it or solicited away customers. *Id.* at ¶ 30, 35-37. Unlike in *Stoneham,* the likelihood of irreparable harm was illusory, rather than "immediately apparent and concrete." *Id.* at ¶ 29 ("In *Stoneham*, the likelihood of irreparable harm was immediately apparent and concrete."); *see e2 Solutions,* 6th Dist. Lucas No. L-08-1295, 2009-Ohio-772, at ¶ 32 (noting that the case did not present the type of evidence "upon which it could be said that the likelihood of irreparable harm was immediate and concrete[.]"). Ultimately in *Aero*, we concluded that "[the plaintiff] did nothing more than make unsubstantiated allegations that it would suffer incalculable or irreparable harm absent injunctive relief." *Id.* at ¶ 25. Perhaps needless to say, that cannot justify the extraordinary remedy of permanent injunctive relief.

{¶30} We see no "immediate" or "concrete" specter of irreparable harm on the record before us. Neither of the officers in question were privy (so far as the

14

record discloses) to any attorney work product from the prosecutor's office, nor did they possess sensitive information regarding the identity of a confidential informant or other witness (because this case did not involve a confidential informant). In other words, the very harm feared by the state—potential divulgence of this information, eventually, to the criminal defendant—necessarily could not happen here. We certainly share the concern about protecting witnesses and informants, and remain cognizant of the ever-present risks borne by confidential informants. But without a confidential informant involved in Mr. McRae's case, this risk is more theoretical than real on our record.

{¶31} Even if we assumed that the officers would divulge confidential information (that they don't have), it remains an open question whether that information could ever end up in the hands of a criminal defendant relying on a public records request. Although that was the state's theory below, it presented no evidence on the likelihood of this eventuality (Mr. Tieger claimed no insights on public records law), and recent authority from the Eighth District undermines the entire argument. *See State ex rel. McElrath v. City of Cleveland*, 2018-Ohio-1753, 111 N.E.3d 685 (8th Dist.). In an opinion by then-Judge Stewart, the court declined to order the production of "disputed OPS records" (OPS is similar to the CCA) when an investigation remained on-going and when Cleveland asserted that the release of the records would "create a high probability of disclosing specific investigatory techniques, procedures and work product." *Id.* at ¶ 10, 21; *see also* R.C. 149.43(A)(2) (confidential law enforcement exception). We need not decide whether to follow the Eighth District's decision today as the issue is not squarely before us—instead, we mention it only to highlight yet another weak link in the state's causal chain.

15

{¶32} And when we step back and consider the broader injunction, which implicates a host of other cases down the road, the "sufficient immediacy and reality" demanded in the declaratory judgment context further fades. *See Burger*, 34 Ohio St.2d at 97, 296 N.E.2d 261. We have no idea what the facts of those future cases might involve, and whether the risk of inadvertent disclosure will be real in those cases. After all, we reiterate, no such disclosure has occurred in the past 17 years, and the absence of past problems may be a testament to the effectiveness of the training discussed by Ms. Neal in her testimony. Tacitly recognizing that point, the state emphasized, both in its opening and closing arguments, that even though CCA investigators will not trespass on these realms, "the point we are trying to make is that information can inadvertently come out." The trial court echoed this point, expressing concern that "these proceedings may inadvertently go beyond the scope of permissible administrative inquiries." But once we start substituting "inadvertence" for clear and convincing evidence of irreparable harm, we essentially dilute the significance of the inquiry. Injunctive relief and declaratory judgment are not meant for speculative forays on hypothetical questions, as confirmed by the Ohio Supreme Court, hearkening back to a case we handed down nearly 80 years ago:

> As the First District aptly noted, in order for a justiciable question to exist, " '[t]he danger or dilemma of the plaintiff must be present, not contingent on the happening of hypothetical future events * * * and the threat to his position must be actual and genuine and not merely possible or remote.' "

*Mid-American Fire and Cas. Co. v. Heasley*, 113 Ohio St.3d 133, 2007-Ohio-1248, 863 N.E.2d 142, ¶ 9, quoting *League for Preservation of Civ. Rights v. Cincinnati*, 64 Ohio App. 195, 197, 28 N.E.2d 660 (1st Dist.1940).

16

{¶33} The state's subjective belief that someday it might suffer irreparable harm is too slender a reed to establish an "immediately apparent and concrete" likelihood of irreparable harm. *Aero Fulfillment Servs.,* 1st Dist. Hamilton No. C-060071, 2007-Ohio-174, at ¶ 26 ("Where the threat of harm is speculative, the moving party must do more than make a conclusory allegation of the threat of harm. There must be evidence to support that allegation."); *TGR Ents., Inc. v. Kozhev,* 167 Ohio App.3d 29, 2006-Ohio-2915, 853 N.E.2d 739, ¶ 33, 40 (upholding denial of injunctive relief where trial court found evidence of irreparable harm "too vague"); *AgriGeneral Co. v. Lightner,* 127 Ohio App.3d 109, 115, 711 N.E.2d 1037 (3d Dist.1998) (party failed to demonstrate "clear right" to be protected from "immediate or irreparable harm" when only presented evidence of "mere plans").

{¶34} In sum, based on the evidence presented, the state failed to prove by clear and convincing evidence that absent the permanent injunction it would suffer irreparable harm. Coupled with the absence of any finding of success on the merits, it obviates our need to evaluate the adequate remedy at law prong of the injunction analysis. We accordingly conclude that the trial court abused its discretion in entering permanent injunctive relief.

III.

{¶35} Based on the foregoing analysis, the state ultimately failed to prove by clear and convincing evidence its entitlement to injunctive relief. The CCA's sole assignment of error is accordingly sustained. With respect to CBUF, we ultimately need not reach the merits of its assignments of error in light of our disposition of CCA's assignment of error and deem them moot. *See* App.R. 12(A)(1)(c). The judgment of the trial court is reversed, and we remand the cause to the trial court with instructions to dissolve the injunction.

17

Judgment reversed and cause remanded.

**ZAYAS, P.J.,** concurs in judgment only.
**WINKLER, J.,** dissents.

**ZAYAS, P.J.,** concurring in judgment only.

{¶36} I agree with the well-reasoned lead opinion concluding that the state failed to establish irreparable harm. However, because we have reversed the judgment of the trial court on that basis, this court should not opine on the merits of the cause of action. Such a discussion is unnecessary to the resolution of this case and ultimately not authoritative. Accordingly, I concur in judgment only.

**WINKLER, J.,** dissenting.

{¶37} In these appeals, we must decide whether the trial court abused its discretion in granting a permanent injunction prohibiting city investigators affiliated with the Citizen Complaint Authority ("the CCA") from conducting interviews of police officers who are state witnesses in ongoing felony criminal proceedings, and in denying the Cincinnati Black United Front's ("CBUF") post-trial motion to intervene.

{¶38} "The grant or denial of an injunction is solely within the trial court's discretion and, therefore, a reviewing court should not disturb the judgment of the trial court absent a showing of a clear abuse of discretion." *Garono v. State*, 37 Ohio St.3d 171, 173, 524 N.E.2d 496 (1988). "An abuse of discretion connotes more than error of law or judgment[.]" *Harris v. Ohio Dept. of Rehab. & Correction*, 10th Dist. Franklin No. 19AP-81, 2019-Ohio-5137, ¶ 10, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "An abuse of discretion contemplates 'an attitude' by the court 'that is unreasonable, arbitrary or unconscionable.' " *Vontz v. Miller*, 2016-Ohio-8477, 111 N.E.3d 452, ¶ 55 (1st Dist.), quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553

18

N.E.2d 597 (1990). "An unreasonable decision is one that is not supported by a 'sound reasoning process.' " *Vontz* at ¶ 55, quoting *AAAA Ents., Inc.* at 161.

{¶39} Mindful of our standard of review, the trial court did not clearly abuse its discretion; accordingly, the trial court's judgment should be affirmed.

{¶40} This case began with the state's complaint for injunctive relief seeking court intervention to prevent the CCA from interviewing two Cincinnati police officers during the felony prosecution of Damion McRae. The two police officers at the center of the CCA investigation had responded to a domestic-violence call involving McRae on March 12, 2017. McRae ambushed the officers with a concealed firearm. Both officers returned gunfire. One officer sustained life-threatening injuries as a result of being shot by McRae. The state indicted McRae for multiple felonies, including attempted murder, felonious assault, and having a weapon under a disability.

{¶41} As the CCA's name implies, its purpose is to investigate citizen complaints of police misconduct, and also investigate serious interventions by police officers. *See* Cincinnati Adm.Code, Article XXVIII, Section 1. In a case of serious intervention, such as the McRae case where officers discharged their weapons, the CCA will not begin an investigation until the Hamilton County Prosecutor's Office determines that it will not prosecute the police officers involved. The CCA also will not begin an investigation until the completion of any criminal investigation conducted by the city.

{¶42} Once the CCA received notice that the officers involved in the McRae matter would not be prosecuted, the CCA moved forward with its investigation of the officers. On January 17, 2018, the CCA sent the officers notices to appear at the CCA office. The notices requested that the officers appear for interviews on January 30,

2018, and February 1, 2018. The notices advised the officers that they may be subject to departmental charges, including dismissal from the police force, if they failed to appear or refused to answer questions.

{¶43} On January 23, 2018, the state filed its complaint and a motion for a temporary restraining order seeking to prevent the CCA from conducting interviews of the officers involved in the McRae matter. In its petition, the state averred that the McRae prosecution was set for trial on February 15, 2018. The state and the city appeared before the trial court for a hearing with their witnesses. Prior to trial, the parties agreed that the dispute between them was not unique to McRae. As such, the parties agreed to broaden the scope of the hearing beyond the McRae matter to all CCA investigations involving police-officer witnesses. The parties also agreed to proceed to a trial with respect to a permanent injunction. After trial, the court found in favor of the state and enjoined the CCA from conducting interviews or hearings involving police officers who are state witnesses in a related felony criminal proceeding until after the criminal proceeding has concluded. CCA appeals the trial court's injunction.[2]

{¶44} The CCA makes several arguments on appeal. The CCA challenges the substance of the state's claim for relief, the state's proof regarding its request for a permanent injunction, and the scope of the injunction issued by the trial court.

{¶45} The CCA argues on appeal that the state's request for permanent-injunctive relief was not based on a "substantive claim." The CCA never disputed the substance of the state's case in the trial court. A cardinal principle of appellate law dictates that courts must not consider arguments raised for the first time on appeal.

---

[2] To the extent that the trial court enjoined the CCA from interviewing the officers involved in the McRae case, that portion of the trial court's decision was rendered moot as of November 2018 when McRae was found guilty at trial and sentenced to over 40 years in prison.

*Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997). The alleged error in the state's case of which the CCA now complains was never raised below. If the CCA wished to pursue this issue it should have raised its argument prior to the conclusion of trial. Because the CCA failed to raise its argument to the trial court, the lead opinion need not have construed the state's complaint as a declaratory-judgment action and need not have discussed Ohio's Declaratory Judgment Act.

{¶46} Nevertheless, the "substantive claim" argument raised by the city is a red herring. An identical argument was rejected in *Hack v. Sand Beach Conservancy Dist.*, 176 Ohio App.3d 309, 2008-Ohio-1858, 891 N.E.2d 1228 (6th Dist.). In *Hack*, the appellants appealed a permanent injunction issued by the common-pleas court. Appellants argued that an injunction could not be entered without a "demonstration of a right to relief under the applicable substantive law[,]" and the appellants cited cases where injunctions had been issued as a result of underlying contract and tort cases. *Id.* at ¶ 22. In rejecting appellants' argument, the *Hack* court reasoned that "[t]he gravamen" of an injunction is that the "defendant is about to commit an act that will produce immediate and irreparable harm for which no adequate legal remedy exists. It is a suit in equity, which requires the court to balance the benefits and burdens that accrue to each party." *Id.* at ¶ 24, citing *Miller v. W. Carrollton*, 91 Ohio App.3d 291, 297, 632 N.E.2d 582 (2d Dist.1993). The complaint had alleged that appellants "were about to act in a manner that would deprive appellees of the enjoyment of their property." *Hack* at ¶ 25. Based on these allegations, the *Hack* court determined that a sufficient cause of action existed. *Id.*

{¶47} The state's allegation that the CCA's practice of conducting interviews of police officers who are witnesses in related criminal prosecutions prior to trial

threatened its prosecution states a sufficient cause of action in equity for the matter to proceed.

{¶48} The CCA's appeal also attacks the evidence underlying the state's permanent-injunction claim. In order for a permanent injunction to issue, a party must show a threat of irreparable harm for which no adequate remedy at law exists. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267-268, 747 N.E.2d 268 (1st Dist.2000). The lead opinion holds that no threat of irreparable harm exists when state witnesses are forced to undergo an interview by a CCA investigator prior to the conclusion of felony proceedings. I disagree.

{¶49} Discovery in the context of criminal cases is much different than discovery between parties to a civil action. *In re Grand Jury Subpoena*, 866 F.3d 231, 234 (5th Cir.2017) ("Civil and criminal proceedings are subject to different procedural rules; less restrictive civil discovery could undermine an ongoing criminal investigation and subsequent criminal case."). Under Crim.R. 16, the state has no pretrial obligation to disclose the expected testimony of its witnesses. As the Ohio Supreme Court has recognized, "Crim.R. 16 is specific to the procedure in criminal cases and therefore is the preferred mechanism to obtain discovery from the state." *State v. Athon*, 136 Ohio St.3d 43, 2013-Ohio-1956, 989 N.E.2d 1006. Along that same vein, generally speaking, a witness in a criminal case has no pretrial obligation to discuss expected testimony. *State v. Zeh*, 31 Ohio St.3d 99, 509 N.E.2d 414 (1987).

{¶50} When the CCA compels a police officer to submit to an interview prior to trial, and the substance of that interview also forms the basis of the expected testimony of that witness at trial, the state has lost its ability to protect the integrity of its prosecution. The state introduced testimony from a veteran felony prosecutor

22

who testified that prior to trial in felony cases, prosecutors discuss confidential information with state's witnesses, including the state's trial strategy, case theories, and confidential witness names. The veteran prosecutor testified as to the concern with a state witness disclosing confidential information during the CCA interview. The veteran prosecutor testified that the state is not permitted to attend the CCA interviews.

{¶51} The CCA attacks the veteran prosecutor's lack of familiarity with the inner workings of the CCA. The prosecutor's lack of insight only highlights the state's inability to protect its interests during the CCA interviews. Whatever information the veteran prosecutor allegedly failed to provide to the trial court regarding the CCA process was more than adequately provided for by the testimony of the CCA director.

{¶52} The CCA director echoed that prosecutors are not permitted to attend a CCA investigator's interview of a police officer. The CCA director testified that after a CCA investigator conducts an interview, the interview is included in an investigative report, which is then a public record subject to release under Ohio's Public Records Act. A criminal defendant, defense counsel, or any other person acting on a defendant's behalf has the ability to make a public-records request for a CCA investigative report and receive the officer's expected testimony, circumventing the criminal-discovery rules and leaving no recourse for the state.

{¶53} The CCA downplays the state's concern that confidential information could be disclosed in its investigative process. It argues that the CCA nonattorney investigators are trained not to ask questions about a criminal prosecution. While laudable that the CCA trains its investigators with respect to state criminal prosecutions, CCA investigators cannot supplant prosecutors in protecting

confidential information. The CCA also posits that the state cannot ensure confidentiality in any of its prosecutions, because any of its witnesses could choose to discuss the substance of their expected testimony prior to trial. This case does not involve a voluntary disclosure of expected testimony. The officers involved in a CCA investigation have no choice and are compelled to disclose their expected testimony, or face job loss. The CCA then publicizes the officers' statements. Finally, the CCA argues that it has been in existence for 17 years and the state has not shown that a defendant has ever gained access to confidential information through the CCA process. The absence of direct evidence that irreparable harm has occurred does not automatically lessen the threat.

{¶54} Although not reached by the lead opinion, I would also hold that the state has no adequate remedy at law to protect its interests in the integrity of its criminal prosecution during the CCA interview process. The CCA suggests that an adequate remedy exists under the Public Records Act, R.C. 149.43, and specifically the confidential-law-enforcement-investigatory-record ("CLEIR") exemption under R.C. 149.43(A)(2). The flaw with the city's line of reasoning is that the state has no ability to control what information qualifies for the exemption—the city retains that power, and the state has legitimate concerns regarding the city's history of dubious interpretation and application of the CLEIR exemption. *See State ex rel. Cincinnati Enquirer v. City of Cincinnati*, Slip Opinion No. 2019-Ohio-3876. The state has no legal mechanism to intervene in the CCA process to protect its interests, which leaves the state with no other choice but to seek court intervention prior to the interviews in order to protect the state's interests.

{¶55} The final issue the CCA raises in its appeal deals with the scope of the trial court's injunction. The CCA argues that the injunction should have been limited

to the officers involved in the McRae case. As the lead opinion acknowledges, "the parties broadened the scope of the temporary restraining order to a permanent injunction and from the McRae case to all cases." (Lead opinion, ¶ 17). Therefore, both parties agreed to the scope of the dispute at trial, and the CCA cannot challenge it now. The record also reflects that the city and the state have quarreled over the timing of CCA investigations more than once. *See State ex rel. Cincinnati Enquirer* at ¶ 15. To require the state and the city to head to court every time a CCA investigation coincides with a felony prosecution would be a waste of time, effort, and resources for the city, the state, and the court.

{¶56} Lastly, it should be noted that an injunction is an equitable remedy, and so whether an injunction will be granted " 'depends largely on the character of the case, the peculiar facts involved and other pertinent factors, among which are those relating to public policy and convenience.' " *Vontz*, 2016-Ohio-8477, 111 N.E.3d 452, at ¶ 54, quoting *Perkins v. Village of Quaker City*, 165 Ohio St. 120, 125, 133 N.E.2d 595 (1956). In balancing the equities between a criminal prosecution and the CCA's parallel administrative proceeding, "due to the significant public interest in law enforcement, criminal prosecutions often take priority over civil actions." *In re Grand Jury Subpoena*, 866 F.3d 231 at 234.

{¶57} The CCA director testified that the CCA waits to begin an investigation until after the Hamilton County Prosecutor's Office completes its initial investigation and declines to prosecute the police officers involved, and the CCA waits until after the city completes its internal investigation. The CCA director testified that this could take up to two years. As such, the CCA director testified that no harm would result to a CCA investigation if the CCA waits until after the completion of criminal

prosecutions in which the police officers are witnesses. The following exchange took place between the CCA director and the trial court:

THE COURT: Is there any harm to CCA investigations, other than their perceived timeliness to withhold these interviews until the completion of the prosecution if there is a prosecution involved like this case?

THE WITNESS: I think the harm is that – is the whole purpose of why the CCA was created. It was to address community and police relations, of which we have a serious problem.

THE COURT: And we did have a serious problem. You would acknowledge that this is sort of the pilot program for Ohio. I think you just said Cincinnati is the only one that has it, right?

THE WITNESS: Yes, I did.

THE COURT: So that this is an evolving entity that is yet to be replicated, correct?

THE WITNESS: In Ohio.

THE COURT: Okay. So what we are trying to do here is figure out a way we can all get along and have the process work for everybody.

So I am – again, in this instance, is there any harm, other than the perception, which I think could be swayed by saying, you know, we've got to do the criminal prosecution first because we can't allow the indirect discovery, what they can't get directly.

Do you understand what I'm saying to you?

THE WITNESS: I do.

THE COURT: Do you see a problem with that?

THE WITNESS: I don't see a problem with that.

{¶58} Based on the CCA's director's testimony, the trial court appropriately balanced the equities in fashioning an injunction. Thus, I would conclude that the trial court did not abuse its discretion in awarding the state a permanent injunction.

{¶59} After the trial court entered its permanent injunction, CBUF moved to intervene and filed a motion for a new trial. Civ.R. 24 governs intervention, and it provides in relevant part:

> [u]pon timely application anyone shall be permitted to intervene in an action * * * when the applicant claims an interest relating to the property or transaction that is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Civ.R. 24(A)(2).

{¶60} Motions to intervene filed after final judgment are not considered timely and are disfavored. *State v. Schulte*, 154 Ohio App.3d 367, 2003-Ohio-3826, 797 N.E.2d 517, ¶ 6 (1st Dist.). We review the denial of a motion to intervene for an abuse of discretion. *Id.*

{¶61} CBUF's motion to intervene was filed after the trial court entered judgment granting a permanent injunction, and therefore, the motion is untimely. CBUF's main contention with the injunction issued by the trial court is its scope. CBUF claims that it had no reason to intervene until the scope of the matter broadened beyond the McRae dispute. Nothing in the record indicates that the trial court's May 31, 2018 hearing on the matter was held sub rosa. CBUF should have

27

filed its motion to intervene sometime prior to the trial court's July 18, 2018 decision on the matter if it felt that the city had not adequately protected its interests up to that point.

{¶62} The attacks CBUF lodges against the trial court's injunction are identical to the attacks made by the city. Therefore, CBUF's interest in the CCA process is adequately represented by the city. The trial court did not abuse its discretion in denying CBUF's untimely motion.

{¶63} Because I would affirm the judgment of the trial court, I respectfully dissent.

Please note:
    The court has recorded its own entry this date.